UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BRIAN LEE,                                      CASE NO.: 9:19-cv-81631-RLR

　　　　Plaintiff,

v.

TAMMY PIERRE and THE SCHOOL BOARD
OF PALM BEACH COUNTY d/b/a The School
District of Palm Beach County, GARY
MOSLEY, DIANNA WEINBAUM and
SHANE SEARCHWELL,

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW

The School Board of Palm Beach County ("School Board") and Tammy Pierre ("Ms. Pierre") (The School Board and Ms. Pierre collectively referred to as "Defendants"), pursuant to Fed. R. Civ. P. 56 moves this Honorable Court for Summary Judgment in their favor and against Brian Lee ("Mr. Lee") on Counts I-V of the Third Amended Complaint because the record evidence establishes there are no genuine issues of material fact that Mr. Lee did not suffer disability discrimination, retaliation, or civil battery and, therefore Defendants are entitled to summary judgment as a matter of law:

## I.     WHO IS SUING WHOM FOR WHAT

In July 2019, the Plaintiff, Mr. Lee sued the School Board alleging he was regarded as disabled in violation of the American's with Disabilities Act, Title 42 U.S.C. 12101 *et. seq.* (Count II) and the Florida Civil Rights Act (Count III) when the School Board terminated him from his job as a bus driver after he failed the State mandated dexterity test. Mr. Lee also claims the School Board subjected him to retaliation in violation of Title VII of the Civil Rights Act (Count IV) and the Florida Civil Rights Act (Count V) after he complained of sexual harassment. Finally, Mr. Lee brings a single claim of civil battery (Count I) against Tammy Pierre, a former supervisor.

## II.     INTRODUCTION

Mr. Lee was terminated in January 2019 because he failed the dexterity test that all bus drivers are required to pass in order to demonstrate that he/she is physically capable of handling a bus, exiting the bus, and evacuating schoolchildren in the event of an emergency. Mr. Lee was not safe to drive a school bus and at the time of his dexterity test he could hardly walk up the stairs of the bus. Mr. Lee's termination had nothing to do with his alleged disability. There is no evidence to demonstrate that it did. In fact, the School Board knew little more than the fact that Mr. Lee had a slight limp and some nodules on his fingers.

1

In reality and unbeknownst to the School Board, Mr. Lee had been suffering from severe gout flare-ups and had been rushed to the hospital at JFK at least five times in 2017 and 2018. Mr. Lee lied on his annual DOT Medical Examination Report Forms and on his annual Post Job Offer Medical History Questionnaires, never disclosing his medications, his complications from his gout, his acute renal failure, or his multiple hospitalizations. Every year, Mr. Lee certified that he did not have issues with his kidneys.

In October 2018, Mr. Lee filed a workers' compensation claim. During his visits to the worker's compensation doctors, he admitted he could not move his leg from the gas to the brake. The doctor refused to release him back to full duty and he admitted to the workers' compensation adjuster that the doctor told him it was not safe to release him to drive a school bus. His claim for worker's compensation was denied because he did not suffer an injury on the job. He **repeatedly** concealed his condition from the School Board. When Mr. Lee returned to the facility, he told a payroll clerk he could not get out of the car to turn in the paperwork because he could not walk. During the worker's compensation investigation, the School Board retained and viewed several videos from Mr. Lee's school bus to determine if he suffered an injury.  The videos showed that several weeks before the alleged injury, he was unable to bring the bus to a complete stop and was using his hand to pick up his leg to place it on the gas and the brake. He was clearly a direct threat to himself, schoolchildren and motorists. The Director of Transportation immediately gave the direction for Mr. Lee to be removed from driving and to submit himself to the state mandated dexterity test. He took the test on December 19, 2018 and failed the first step.

Mr. Lee also claims he suffered retaliation because he made a complaint of sexual harassment against his former supervisor, Tammy Pierre. The record evidence shows there was no sexual harassment, the complaint was not made in good faith, and there was no protected activity. Mr. Lee was sent to Belle Glade, told to sit at home with pay, and temporarily reassigned to work in the Maintenance and Plant Operations Department because of his misconduct, which began in April 2016 and continued through November 2018. There is no causal connection between the alleged adverse actions and his complaint. Finally, Mr. Lee cannot demonstrate he suffered a battery. Ms. Pierre touched his shoulder and his back in an attempt to get his attention. The witness described it as friendly and "meant to get his attention". Mr. Lee has not demonstrated Ms. Pierre acted with malice or in bad faith and, therefore, there is no basis to pierce sovereign immunity and hold her personally liable. There are no genuine issues of material fact and the School Board and Ms. Pierre are entitled to summary judgment as a matter of law.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Speculation or conjecture cannot create a genuine issue of material fact, and a mere scintilla of evidence in support of the nonmoving party cannot overcome a motion for summary judgment." S*ee Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Jest v. Archbold Med. Ctr., Inc.,* 561 F. App'x 887, 888 (11th Cir. 2014). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Shoe Show, Inc.*, 38 F. Supp. 3d 1343, 1354–55 (N.D. Ga. 2014) (emphasis in original) (citation and internal marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### IV.   ARGUMENT

**A. Summary Judgment is Appropriate on Counts II and III because there are No Genuine Issues of Material Fact that Mr. Lee was Not Regarded as Disabled.**

"The ADA prohibits … employers from *discriminating against a qualified individual on the basis of disability in regard to the discharge of employees*." *Collier v. Harland Clarke Corp.,* 820 F. App'x 874, 878–79 (11th Cir. 2020) (citing 42 U.S.C. § 12112(a) (Internal alterations omitted) (E.S.)). The *McDonnell Douglas* burden-shifting framework is applicable to ADA claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under McDonnell Douglas, a plaintiff must first establish a *prima facie* case of discriminatory discharge, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. *Collier,* 820 F. App'x at 878–79 (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359–61 (11th Cir. 1999)). An employer's burden to articulate a non-discriminatory reason is one of production and is "exceedingly light." *Perryman v. Johnson Prod. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983).

If the employer articulates a non-discriminatory reason for its decision, the burden then shifts back to the plaintiff to demonstrate the reason for the decision was really a pretext for discrimination. *Collier,* 820 F. App'x at 878–79. "If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether …the … proffered reasons [are] pretextual, the defendant is entitled to summary judgment." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir. 2001). [T]he ultimate burden of persuasion remains on the plaintiff at all times. *Foreman v. Norfolk S. Corp.*, No. 5:15-CV-140 (CAR), 2017 WL 1217174, at *4 (M.D. Ga. Mar. 31, 2017).

To establish a *prima facie* employment-discrimination case under the ADA, the plaintiff must show, at the time of the adverse employment action: (1) he was regarded as having a disability; (2) he was a qualified individual for the position; and (3) the employer discriminated against him because of his disability. *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016). The ADA defines a disability as, among other things, being regarded as having such an impairment." *Bosarge v. Mobile Area Water & Sewer Serv.*, No. 1:18-CV-240-TFM-N, 2020 WL 2820201, at *15 (S.D. Ala. May 29, 2020). ADA and FCRA claims are analyzed under the same framework. *Lyons v. Miami-Dade County*, 791 F. Supp. 2d 1221, 1227 (S.D. Fla. 2011).

1. The School Board Was Unaware of Mr. Lee's alleged Disabilities

An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes he has been subjected to a prohibited action because of an actual or perceived physical/ mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *id*. (citing § 12102(3)(A)). "Demonstrating an employer's knowledge of the plaintiff's condition is an essential element of establishing a *prima facie* case." *Morisky v. Broward Cty.*, 80 F.3d 445,447 (11th Cir. 1996) ("At the most basic level, it is intuitively clear …[]..an employer cannot fire an employee "*because of*" a disability unless it knows of the disability.).[1] "For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability." *Id.* "[A]bsent knowledge of a disability, speculation about the cause of a problem does not impute knowledge to [d]efendants" *Id*. "The mere fact an employer is aware of an impairment is not sufficient to show the employer

---

[1] ADA liability "requires the employer to have discriminated *because of* the employee's disability, [and] the employee must show the employer knew of his alleged disability at the time it took the adverse employment action." *Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1292 (M.D. Ala. 2012), *aff'd,* 550 F. App'x 748 (11th Cir. 2013).

regarded the employee as disabled." *Guadamuz v. Entercom Miami, LLC*, No. 17-22617, 2019 WL 1566263, *5 (S.D. Fla. Jan. 30 2019). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Scott v. Shoe Show, Inc.,* 38 F. Supp. 3d 1343, 1361 (N.D. Ga. 2014). [2]

 In *Colclough v. Gwinnett Pub. Sch.,* 734 F. App'x 660 (11th Cir., 2018), plaintiff, a crossing guard, brought an ADA discrimination claim against the school district claiming he was fired because of his cancer. *id.* at 663. The Eleventh Circuit affirmed summary judgment for the district explaining: "Colclough failed to present any evidence indicating that his supervisor, or any other decisionmaker, knew of his cancer. Indeed, Colclough admits…he did not advise anyone employed by the …district of his cancer diagnosis. Colclough also did not present evidence reasonably suggesting the … district's decisionmakers had ...notice of his cancer." *Id.*

In *Scott v. Shoe Show, Inc.*, the court granted Shoe Show summary judgment because the plaintiff "never advised anyone she had a disability, nor did she ever request an accommodation for her disability in order to be able to perform her job." *Scott v. Shoe Show, Inc.*, 38 F. Supp. 3d 1343, 1361 (N.D. Ga. 2014). The court explained "[t]he ADA does not require clairvoyance, [a]sking the employer to guess ... is asking too much of the employer, and of the ADA." *Scott*, 38 F. Supp. 3d at 1361; *See Guadamuz v. Entercom Miami, LLC*, No. 17-22617, 2019 WL 1566263, *5 (S.D. Fla. Jan. 30 2019) (Granting summary judgment because "[p]laintiff provided no doctor's note, medical records or, or any other evidence to support her contention that [d]efendant knew she suffered from depression and anxiety" other than her own testimony.")

In this case, the uncontroverted record evidence demonstrates the School Board did not know of Mr. Lee's gout and kidney conditions. SUMF, ¶¶22, 23, 29, 30, 34. Mr. Lee never told anyone at the School Board he had a disability nor did he ask for an accommodation. Ex. 7. Mr. Lee never told anyone at the School Board he was taking sick time because of his gout and never asked for time off in connection with his gout. *Id*. Similarly, Mr. Lee fails to identify any evidence demonstrating the School Board knew of his kidney issues (because it didn't). Mr. Lee contends the School Board knew of his kidney issues because he "allowed worker's comp to" get his medical records, but the School Board never received any of his medical records and there is no record evidence to demonstrate otherwise. Ex. 7; Ex. 15, ¶8.

---

[2] "An employer cannot be liable under the ADA for firing an employee when it indisputably **had no knowledge of the disability."** *Guasch v. Carnival Corp.*, 723 F. App'x 954, 956 (11th Cir. 2018) (Emphasis in original).

The first time the School Board received a scant amount of medical information was in October 2018 through its work comp adjuster after Mr. Lee filed a workman's compensation claim and, during check-ins with the adjuster, was reported as rude and unprofessional. SUMF, ¶49; Ex. 1 at Ex. 43; Ex. 8.  His misconduct was communicated to the Risk department, which also received copies of the adjuster's notes detailing Mr. Lee's admissions he could not move his foot from the pedal to the brake. Ex. 1 at Ex. 43. While the School Board learned about his movement limitations *after* he filed a workman's compensation claim and *after* reviewing bus videos showing Mr. Lee moving his leg with his hand, these are insufficient to input knowledge of his gout and kidney conditions to the School Board. Ex. 7;[3]Ex. 1, 473-474; 478:8-480 "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of an employee's disability." *Colclough v. Gwinnett Pub. Sch.*, 734 F. App'x 660, 663 (11th Cir. 2018). The record evidence demonstrates Mr. Lee concealed his conditions from the School Board when he misrepresented his health on Post Job Offer Medical History Questionnaires disclaiming use of medication, hospitalizations, and checked the "No" for virtually every health condition listed including kidney conditions. SUMF, ¶¶ 22-37; Ex. 1 at Ex. 53, 55, 56, 59.

Similar to the *Colclough*, *Scott*, and *Guadamuz* decisions, each of which granted defendants summary judgment on ADA discrimination claims because the respective plaintiffs failed to present any evidence indicating supervisors or decision-maker knew of the disabilities, never advised anyone of the alleged disabilities, never requested accommodations, never provided a doctor's note, medical records, nor any other evidence to support the contention that defendants knew of the disabilities, this Honorable Court should grant the School Board summary judgment on the ADA discrimination claims because the evidence demonstrates his supervisors or decision-makers did not of his disabilities, he never told anyone of his alleged disabilities, never requested an accommodation, never provided a notes or medical records disclosing his disabilities, nor presented any record evidence demonstrating the School Board knew he was disabled.

---

[3] "4. Did you tell anyone working at the School Board (including, but not limited to, anyone at the District offices or any supervisor's in the transportation department) that you suffered from gout? Had gout exacerbations/flare-ups?

Response: No."

"5. State each date You contend You notified anyone with the School Board that You had been, or would be, absent from work due to gout…"

Response: None"

2.  Mr. Lee Is Not a Qualified Individual with a Disability

"In order to make out the second prong of his *prima facie* case, the plaintiff must prove he is a *qualified individual* – that is, someone with a disability who, *with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires*." 42 U.S.C. § 12111(8) (E.S.). An ADA plaintiff must show ability to perform essential functions of his job with or without an accommodation. *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005).

a.  Driving is an Essential Function and Mr. Lee Could Not Drive Safely

Mr. Lee is not a *qualified individual* because driving is an essential function of the position and he could not drive a school bus safely. SUMF, ¶15. "The basic function of a bus driver is to operate his motor vehicle in a timely, responsible fashion. It is essential that a driver perform these duties in a way that does not threaten the safety of his passengers or of other motorists." *Myers v. Hose*, 50 F3. 278, 282 (4th Cir. 1995). "The *essential functions* of a job are …the fundamental job duties of the employment position the individual with a disability holds or desires, and does not include the marginal functions of the position." *Foreman v. Norfolk S. Corp.*, No. 5:15-CV-140, 2017 WL 1217174, at *6 (M.D. Ga. Mar. 31, 2017).[4] "To resolve the question whether a person is an "otherwise qualified individual" a court must first consider whether that person is able to perform the essential functions of the job in question." *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995). In *Myers v. Hose*, the Fourth Circuit affirmed summary judgment for the county on a Rehabilitation Act discrimination claim.[5] Myers, a city bus driver, was notified he was unqualified to operate a county vehicle because he failed the physical examination required by both the county and FDOT. *Myers,* 50 F.3d at 281. He had a history of serious health conditions including hypertension and phlebitis[6] of both legs, for which he had been hospitalized twice. *Id*. at 280.

---

[4] "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors" *Id*.  In making this determination consideration is given to the employer's judgment as to what functions are essential. *Id*. The ADA regulations also identify other factors for consideration including: (1) the amount of time spent on the job performing the function; (2) consequences of not requiring the employee to perform the function; (3) the terms of a collective bargaining agreement; (4) the work experience of past employees in the job; and (5) the current work experience of employees in similar jobs. *Id*.

[5] "The Rehabilitation Act shares the same standards for determining liability as the Americans with Disabilities Act (ADA), 42 U.S.C. § 1201." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

[6] "[P]hlebitis is a blood clot that develops in a vein close to the surface of the skin. These types of blood clots do not usually travel to the lungs unless they move from the superficial system into the deep venous system first. Typically, however, they cause pain." Found at: https://my.clevelandclinic.org/health/diseases/16754-venous-disease.

The court determined Myer's health problems precluded him from satisfying the basic requirements of the bus driver position. *Id.* at 282. Myer's health conditions could present dangerous conditions while behind the wheel and he would be powerless to maintain control over the vehicle. *Id.* "Because this would profoundly compromise the safety of his passengers, pedestrians, and other motorists, Myers is unable to perform his essential duties." *Id.* In rejecting the idea that the county was required to allow time for Myer's health to improve as a reasonable accommodation, the court explained the law requires Myers be presently able to perform the functions with or without an accommodation and the county cannot be forced to standby while he endeavors to improve his health as such would be a significant burden. *Id.* at 283.

In this case, driving is an essential function. SUMF, ¶15. Mr. Lee admits his job was to pick up and transfer students to/from school. SUMF, ¶¶7-8. The Director of Transportation, Shane Searchwell testified driving is THE essential function of the position. Ex. 2, 13-25:9. The job description identifies driving as an essential function**.** SUMF, ¶16. The factors in the ADA regulations also support a finding that driving is an essential function. Mr. Lee drove at least two shifts daily including an early morning shift and an afternoon shift**.** Ex. 1, 24: 21-23; 25:1-25; 27: 17-25. All bus drivers in the position are required to have a valid Commercial Driver's License ("CDL"). SUMF, ¶ 15, Ex. 1 at Ex. 3. Mr. Lee was not qualified to operate a school bus. The record evidence demonstrates in May 2018, he did not report to work and had unexplained absences for almost 3 weeks. Ex. 1, 323: 14-16; 21-24; 333:20-25; 334: 1-2. When the School Board finally made contact, he was asked to present a doctor's note to explain his absences. Ex. 1 324: 18-22; 325: 7-21; 333:11-14; Ex. 1 at Ex. 29, Comp Ex. 30, Ex. R. The note covered a mere 3 days and did not say anything about gout or kidney issues. Ex. R. Upon return he was instructed to undergo the annual medical evaluation and dexterity exam, since his annual MEC card expired on May 1, 2018.Ex. 1, 334:3-336:1; Ex. 1 at Comp Ex. 30, Ex. 56.  He presented to the School Board's DOT physician and was granted a 3-month Medical Examination Card ("MEC") instead of 1 yr. because of hypertension, the School Board accepted the certification. SUMF, ¶34.

In May 2018, the School Board did not know Mr. Lee was in severe pain or that he was concealing his conditions. The evidence demonstrates he was suffering from severe pain in his left knee, did not report to work for 3 weeks because of the pain, made a personal visit to Dr. Daniel Lee at MDNow 3 days before his DOT physical and dexterity exam demanding an anti-inflammatory shot to reduce the pain in his knees before reporting to work. SUMF, ¶33;[7] Ex. 1 at

---

[7] The School Board obtained this and other personal medical records during discovery. The School Board

Ex. N. In June 2018, Mr. Lee told his doctor, Dr. Gemayel, he failed the DOT physical because of hypertension; he never told anyone at the School Board. Ex. 1 at Ex. 38.

On or about October 16, 2018, Mr. Lee claimed to suffer a worker's compensation injury by "bumping his knees". SUMF, ¶38. Over the ensuing 10 days while the adjusters were investigating the alleged injury, Mr. Lee was sent to MDNow doctors for diagnosis and treatment. SUMF, ¶39.  During treatment Mr. Lee told an MD Now doctor he could not move his foot from the pedal to the brake. SUMF, ¶40. On or about October 26, the doctor told him it was not safe to release him to drive, the claim was denied because the doctor believed the injury was pre-existing, and he was released on light duty. *id.* at Ex. 1, 521:23-25; 522: 1-5. Mr. Lee told the adjuster he had issues with blood pressure and passing his May 2018 DOT physical. Ex. 1 at Ex. 43. Around October 29, Mr. Lee admitted to Mr. Orozco, a payroll clerk that he could not walk. SUMF, ¶46; Ex. 1 at Ex. 48. Mr. Lee admits he had trouble moving his foot from the pedal to the brake. SUMF, ¶43-44; Ex. 1, 525:2-7; 11-15; 555:2-7. He admits, at times while driving, he would use his hand to pick up his leg to move it from the gas to the brake. *Id.*; Ex. 1, 502: 24-25; 503: 1-5.  He admits the leg he picked up with his hand was the leg he used to brake the school bus, which could present a safety issue. SUMF, ¶43; Ex. 1 at Ex. 42,  Ex. 1, 507:9-25; 508:1-7; 527: 4-11. He admits he was in pain while driving school buses even before his alleged worker's compensation injury claim. Ex. 1, 554:2-11; Ex. 1 at Ex. 41.

Just as in *Myers*, where the court granted summary judgment finding Myers was not a qualified bus driver after he failed his physical exam and that his hypertension, phlebitis, and other health conditions could present dangerous conditions behind the wheel which could profoundly compromise the safety of his passengers, pedestrians, and motorists, this Honorable Court should grant the School Board summary judgment on the ADA discrimination claims because he was not a qualified bus driver because he failed the dexterity test and the evidence including Mr. Lee's admissions, demonstrate his gout and other limitations could present dangerous conditions behind the wheel, which could profoundly compromise the safety of himself, the schoolchildren, pedestrians, and motorists.

---

did not have these medical records in its possession during Mr. Lee's employment.

### b.  Plaintiff Could Not handle Reasonable Necessary Stress of the Job

"The ADA protects only *qualified* employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one." *Snider v. U.S. Steel-Fairfield Works Med. Dep't,* 25 F. Supp. 3d 1361, 1367 (N.D. Ala. 2014), *aff'd,* 591 F. App'x 908 (11th Cir. 2015) (citing *Williams v. Motorola, Inc.,* 303 F.3d 1284, 1290 (11th Cir.2002) ("An employee's ability to handle reasonably necessary stress and work reasonably well with others [is an] essential function[ ] of any position.")).

In this case, the record is replete with evidence Mr. Lee threatened co-workers and was sent to counseling and anger management to deal with his misconduct. In April 2016, he had an altercation with a bus attendant while she was placing a handicap student in a bus seat. SUMF, ¶59. In December 2016, he parked in the wrong parking spot and after being asked to move he responded in a fit of rage, approached the female driver as though he was going to strike her because she asked him to re-park. SUMF, ¶ 60. Mr. Lee admits he held back from engaging in a physical confrontation and received a written reprimand for his misconduct. *Id.* In May 2017, he was accused of hitting a co-worker with a bathroom stall door; he did not recall if he propositioned the employee to fight in the parking lot and he received a written reprimand for his misconduct. SUMF, ¶ 61. Because of his behavior towards co-workers, Mr. Lee was sent to the School Board's Mandatory Employee Assistance Program at least three times to. SUMF, ¶ 62. Several co-workers reported they were afraid of him. SUMF, ¶ 70.  He was also sent to anger management. SUMF, ¶71. His misconduct continued up until November 2018 when he threatened an employee in Risk Management, and was unprofessional towards MDNow staff and doctors when he refused treatment. SUMF, ¶ 74. The record demonstrates Mr. Lee was unable to handle reasonably necessary stress at work and was unable to work reasonably well with his co-workers and, as such, was not a qualified individual under the ADA.

### c.   Plaintiff was a Direct Threat to himself, Schoolchildren, and Motorists

The uncontroverted evidence demonstrates Mr. Lee was not qualified under the ADA because he had trouble moving his foot from the gas to the brake and did not have full range of movement in his legs, which posed a direct threat to the safety of himself, schoolchildren, and motorists. SUMF, ¶¶42-45; Ex. 1, 522: 6-9; 525:4-25; 527:4-11; 555: 2-7. "An individual is also not a qualified individual if, by performing the duties of a given position, he would pose a *direct threat* to himself. *Bosarge v. Mobile Area Water & Sewer Serv.,* No. 1:18-CV-240-TFM-N, 2020 WL 2820201, at *15–16 (S.D. Ala. May 29, 2020) (Internal quotations omitted) (E.S.)

"The ADA defines a *direct threat* as *a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.*" *id* (citing 42 U.S.C. § 12111(3) (E.S.)). Regulations have extended the definition of *direct threat* to include threats to the worker himself. *Id.*

In *LaChance v. Duffy's Draft House, Inc.*, the Eleventh Circuit affirmed summary judgment for Duffy's on LaChance's ADA claim determining he was not qualified under the ADA as a line cook because he could not perform the essential functions of the job without threat of harm to himself or others. *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998). LaChance had a history of complex partial seizures affecting his ability to perform the essential functions of the job. *Id.* at 834. LaChance admitted he posed a risk to himself and others while working around a gas flat top grill and slicing machines. *Id.* "[O]nce an employer reasonably identif[ies] an employee as posing a risk of harm, the ADA [does] not require the employer to accept that risk…it [is][an] entirely untenable position that [plaintiff's] employer or co-employees should have to bear the personal risk and legal liability that could have resulted from an accident due to [the medical condition]. *Id.* In affirming summary judgment, the Eleventh Circuit explained, "LaChance's loss of consciousness was not only a danger to himself, but due to the working environment, was a danger to others as well." *id.* at 836.

In this case, Mr. Lee admits he had trouble moving his foot from the pedal to the brake. SUMF, ¶44. He admits, at times, while driving he would use his hand to pick up his leg to move it from the gas to the brake. SUMF, ¶43. He admits the leg he was picking up was the same leg he used to brake the school bus, which could present a safety issue. *Id*; Ex. 1 at Ex. 42. On or about October 29, Mr. Lee admitted to Jack Orozco, a payroll clerk that he could not walk. SUMF, ¶46. In deposition, Mr. Lee explained the trouble he experienced with his leg could pose a safety issue, stating:

| | |
|---|---|
| **Pg. 522**<br>6   Q.  Do you need full<br>7 range of motion in your legs to drive a …bus<br>8 safely?<br>9    A.  Yes.<br>**Pg. 525**<br>4  Would you ever use<br>5 the clutch to slow the bus down?<br><div align="center">***</div>8    A.  Yeah.  Because when you shift it, you<br>9 engage the clutch, you would …be shifting<br>10 your gears and slowing your bus down | 20 Q. [Y]ou were having a difficult time moving<br>21 your leg from the pedal to the brake, correct?<br><div align="center">***</div>25    A.  Yes.<br>**Pg. 527**<br>4    Q.  ..If you're having trouble moving<br>5 your leg from the pedal to the brake, does that<br>6 present a safety issue, Mr. Lee?<br><br>11    A.  Yes<br>**P. 555**<br>2 Q.  You told the MD Now<br>3 doctor that you couldn't move …your foot<br>4 from the pedal to the clutch, right?<br><div align="center">***</div>7    A.  Yes. |

Similar to the Eleventh Circuit's *LaChance* decision, affirming summary judgment on the ADA claim and finding LaChance not qualified under the ADA because his seizures prevented him from working as a line cook and operating machinery essential to the position without posing a direct threat to himself and others and explaining the employer and co-workers should not have to bear the personal risk and legal liability resulting from an accident, this Honorable Court should grant the School Board summary judgment and find that Mr. Lee not qualified under the ADA because he could not safely drive a bus without posing a direct threat to himself and others, and neither the School Board, schoolchildren or their parents, or motorists should have to bear the personal risk or legal liability that could result from an accident.

3.   Mr. Lee was Terminated Because He Failed the State Mandated Dexterity Test

The record evidence discloses any possibility that Mr. Lee's termination arose from circumstances raising an inference of discrimination; he was terminated because he failed the state mandated dexterity test. The third element of Mr. Lee's disability claim, requires he show discriminatory motivation was the but-for cause of his termination. *Collier v. Harland Clarke Corp.,* 820 F. App'x 874, 878–79 (11th Cir. 2020). "The mere fact that an employer is aware of an impairment is not sufficient to show…that the perception caused an adverse action." *Guadamuz v. Entercom Miami, LLC*, No. 17-22617, 2019 WL 1566263, *5 (S.D. Fla. Jan. 30 2019).

In this case, Mr. Lee admits he did not seek an accommodation, he never provided a doctor's note disclosing his gout condition, or that it was disabling, nor disclosing he suffered from kidney issues. Mr. Lee falsified information on his medical authorization forms preventing the School Board from knowing he suffered from gout or kidney disabilities. SUMF, ¶¶22, 23, 30, 34. Mr. Lee had been hospitalized several times during his employment but he concealed these hospitalizations from the School Board. SUMF, ¶¶ 24-28; Ex. 36 (5/17 – leg pain). [8] Dr. Gemayel instructed Mr. Lee to submit to the dexterity test after he took his medicine assuming it reduced the swelling in his hand and fingers. SUMF, ¶55; Ex. 1, 559:18-25; 560-562:6; Ex. 1 at Ex. 50. On December 14, 2018, Dr. Gemayel told Mr. Lee it would take about 7 days to reduce the swelling in his hand sufficient for him to take the dexterity test. SUMF, ¶55 Mr. Lee did not tell anyone about these instructions, he did not wait the 7 days, but instead submitted to the test and failed on December 19, 2018. SUMF, ¶56.

---

[8] These medical records were received during discovery.

The School Board did not terminate Mr. Lee when it learned of his movement limitations and his admission that he could not walk. SUMF, ¶54. Instead, he was instructed to submit to a dexterity test consistent with job relatedness and business necessity. *Id.* He was given three opportunities to take the test; he refused twice. SUMF, ¶52-53. Mr. Searchwell, the decision-maker and Director of Transportation, did not regard Mr. Lee as disabled and he explained why the dexterity test was administered:

| | |
|---|---|
| **P. 175**<br>15  Q   **Now**, … **when you terminated**<br>16 **Mr. Lee** on January 8 of 2019 --<br>***<br>20 **did you regard** Lee as disabled from being able<br>21 to drive a school bus?<br>***<br>25 No, sir. …<br>**P.177**<br>19  Q   I believe the dexterity test established that<br>20 he didn't pass … item number 1…<br>***<br>24   A   Yes.<br>**P.178**<br>7   Q   You said you had received reports that he<br>8 couldn't move his foot from one pedal to the other,<br>9 correct?<br>10   A   Yes, I did.<br>11   Q   Did you consider him to have a physical<br>12 disability that prevented him moving his foot from<br>13 one pedal to the other? | ***<br>17   THE WITNESS:  I did not think in any way,<br>18   shape, or form of him having any disabilities.<br>**P.180**<br>3 If you didn't believe that Mr. Lee had<br>4 a physical problem, why… ask him to take another<br>5 dexterity test when he passed a dexterity test in<br>6 May of 2018 that was good until June of 2019?<br>***<br>11 if I get information from the medical<br>12   folks … this person has told them...he cannot<br>13   move from the throttle to the brake, do you<br>14 understand how serious is on a big yellow bus?<br>19   If I get word that the person cannot do that,<br>20   it is my responsibility to …[]<br>21   …[]…figure out what is going on here.<br>22 I cannot turn a blind eye… So I recommended<br>23   for the dexterity test to be done. |

"[T]he business necessity standard may be met even *before* an employee's work performance declines if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Kirkish v. Mesa Imports, Inc.*, 442 F. App'x 260, 261 (9th Cir. 2011). "Job[-]relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions and [b]usiness necessity, in contrast, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test …in decision making." *Allmond v. Akal Sec., Inc.,* 558 F.3d 1312, 1317 (11th Cir. 2009).[9] All school bus drivers, including Mr. Lee, must obtain medical examination certifications ("MEC") from DOT approved physicians and submit to and pass a dexterity test ***at least annually*** to ensure

---

[9] An employer can apply a qualification standard if the standard is shown to be job-related for the position in question and consistent with business necessity. *Foreman v. Norfolk S. Corp.*, No. 5:15-CV-140 (CAR), 2017 WL 1217174, at *8 (M.D. Ga. Mar. 31, 2017).

the drivers can safely operate the buses. Ex. 1, 573:25-574:4; 574:11-15. Florida Administrative Code 6A-3.0141 requires every school bus operator:

> "Be physically capable of operating the vehicle as determined by physical examination, in accordance with 49 CFR 391.41, as evidenced by the Medical Examiner's Certificate (Form MCSA-5876) and …[]…_ **as determined by a dexterity test** administered by the school district."

Fla. Admin. Code Ann. r. 6A-3.0141. (E.S.) The dexterity test ensures drivers are physically capable of handling and evacuating a school bus in the event of an emergency. SUMF, ¶20; Ex. 4, 49:2-8. The test has five steps, each consistent with demonstrating the ability to handle a 65 passenger school bus and evacuate children in an emergency. SUMF, ¶¶20, 52, 53. The driver must climb and descend the steps without pausing (step 1), manually open and close the door from a seated position or manually open the air door (step 2), activate the brake within ¾ of a second after removing the right foot from the throttle (step 3), move from sitting in the driver's seat out the rear emergency door in under 20 seconds (step 4), and operate the driver controls with both arms simultaneously and quickly (step 5). *Id*. The uncontroverted record evidence demonstrates Mr. Lee was not regarded as disabled and the MEC process and dexterity test are job related and consistent with business necessity. After Mr. Lee notified MDNow, the York adjuster, and Mr. Orozco that he was having trouble moving his foot from the pedal to the throttle it was critical and an absolute necessity that he submit to a dexterity test to demonstrate he could drive safely. The School Board was not obligated to wait until Mr. Lee had an accident resulting in bodily injury and/or death before doing so. Mr. Lee was terminated because he failed the dexterity test and <u>not for </u>being regarded as disabled. SUMF, ¶¶3, 56.

**B. <u>Summary Judgment is Appropriate for the School Board on Counts IV-V because there are No Genuine Issues of Material Fact Mr. Lee Did Not Suffer Retaliation.</u>**

"To make a *prima facie* case for a claim of retaliation under Title VII, a plaintiff must first show: (1) [H]e engaged in statutorily protected activity; (2) [H]e suffered an adverse action; and (3) the adverse action was causally related to the protected activity." *Id.* If a "*prima facie* case is established, it creates a presumption that the adverse action was the product of an intent to retaliate." *Id*. "The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action. If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that

the *proffered reason was merely a pretext to mask [retaliatory] actions*. *Id*. "[T]he ultimate burden of persuasion remains on the employee." *id*. [10]

    1.  Mr. Lee's Complaint—the alleged Protected Activity-- was Not Made in Good Faith

Mr. Lee did not have a good faith subjectively reasonable belief that Ms. Pierre's contact with his shoulder and back was sexual harassment nor would a reasonable person observing the interaction find it offensive. "[T]o demonstrate that [a] complaint of sexual harassment constitute[s] *statutorily protected expression*, [a plaintiff] …must demonstrate *a good faith, reasonable belief* that [the employer] was engaged in unlawful employment practices." *Tatt v. Atlanta Gas Light Co.*, 138 F. App'x 145, 147 (11th Cir. 2005) (E.S.). In other words, [a plaintiff] must prove both: (1) a subjective, good-faith belief [the employer] engaged in an unlawful employment practice; and (2) that [his] belief was objectively reasonable. *Id.* "We measure *against existing substantive law* the objective reasonableness of [a plaintiff's belief that the employer] engaged in an unlawful employment practice." *Id.* (E.S.). "For an employer's conduct to constitute actionable sexual harassment, it must be *so objectively offensive* as to alter the conditions of the [employee's] employment." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (Internal quotations omitted) (E.S.).

"A plaintiff must show, among other things, that the harassment occurred because of his sex and the conduct in question [was] severe or pervasive enough that a reasonable person would find it hostile or abusive. *Tatt*, 138 F. App'x at 147–48. To determine if the conduct is sufficiently severe or pervasive, we consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the job performance." *Id.* To support a retaliation claim, … the [alleged] conduct must be *close enough to support an objectively reasonable belief that it is* [sexual harassment]. *Id.* The Supreme Court described the kind of conduct that falls outside the realm of sexual harassment in *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002–03, 140 L.Ed.2d 201 (1998), explaining:

> "[T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the [employee's] employment."

---

[10] "The FCRA is patterned after Title VII" and "federal case law on Title VII applies to FCRA claims." *Palm Beach Cty. Sch. Bd. v. Wright*, 217 So. 3d 163, 164–65 (Fla. 4th DCA. 2017).

The Supreme Court explained the conduct must be severe or pervasive enough <u>that a reasonable person would find it hostile or abusive</u>. A requirement that is <u>crucial</u> **"to ensur[ing] that courts and juries do not mistake ordinary socializing in the workplace—**such as ... intersexual flirtation—**for discriminatory conditions of employment**." *Clover*, 176 F.3d at 1351. (E.S.)

In this case, the conduct described by Mr. Lee is nothing more than interoffice socializing, and by no stretch of the imagination could be considered sexual harassment from either a subjective or objective standpoint. Mr. Lee's describes the contact as ***innocuous***, stating, merely:

> "*[W]hile in the office doorway at Royal Palm, Tammy Pierre put her hands on me while I was speaking with Jack*."

SUMF, ¶64. Mr. Lee's explanation of the contact in deposition is similarly unpersuasive. Ms. Pierre complimented Mr. Lee's shirt and told him it was nice material and she touched his back. *Id*. Although Mr. Lee says he was "very offended" by the compliment because Ms. Pierre was his supervisor, a reasonable person would not view the interaction or contact as offensive. Ex. 1, 373:17-25. Mr. Lee could not articulate why he believed the contact was sexual other than stating, "it just felt sexual to me". Ex. 1, 374: 14-20; 22-25; 375:1. Jack Orozco, a payroll clerk, witnessed the contact, which he described as "friendly" and intended to "get [Mr. Lee's] attention". SUMF, ¶65. In this scenario, Mr. Orozco is THE reasonable person and his explanation of the contact underscores the innocuous nature of the interaction, finding the interaction so underwhelming he "went back to do[ing] [his] job" until the conversation ended:

---

**P. 14**
A.   Okay.  I was sitting like I am right now
22 looking at you, doing my -- … working on my
23 payroll and all that.  And all of a sudden…
**P.15**
1 [I'm working] in front of my computer…[]…, all
2 of a sudden I see -- I turn around, and … I
3 see Mr. Lee standing … on the left side frame of
4 my door.
5 So I turn around.  I say, "Hey, how are you
6 doing, Mr. Lee?"  You know.
7 And so at the same time that I'm doing
8 that, …I see Ms. Pierre coming from the back and
9 starting interacting with him. "Hey, how..you doing?"
10 … in a friendly manner, "Hi, how are you doing
11 Mr. Lee," and all of that.

22 **Q**.   Did you observe Ms. Pierre touch Mr. Lee?
23 **A**.   Yes, I did.  When she was coming and I was
24 looking at him … having an interaction with him,
25 I saw her putting her hand and his …upper back
**P.16**

5  And, you know -- and at that time, I just,
6 … like I said, a few seconds later, I just turned
7 around and I went back to do my job.  .. they just
8 continued.  I don't know after that.
***
19 **Q.**   Did you see her touch his midsection?
***
23   ….[]….yeah.  In
24 the middle of his back.  Right in the middle.
**P. 17**
2 **Q.** So what you observed was her touching
3 Mr. Lee, and then touching …
4 the middle of his back.
5 **A.** Like I said, when I turn around, she greet
6 him friendly.  He greeted her….he turned
7 around.  I saw her -- … hey, to get -- you know,
8 a pat on the back, in the middle of his back...that
9 was it…
11 **Q.** What did Mr. Lee do when she touched
12 him?
13 **A**.  Like I said, turned around.  Because he was
14 facing me.  Turned around and interact with her.
15 Friendly.  I didn't see anything… and that's

---

| 2      **A.**   Like right in the middle, like trying to 3 get his attention.  "Hey, Mr. Lee.  How are you doing, 4 sir? | 16 when I -- like I said, I sort of see -- I turned around 17 and I continued working. |
|---|---|

After the interaction, Mr. Lee did not tell Mr. Orozco he was scared or intimidated. Ex. 1 at 13-14; 395:2-4. In fact, he had a 10-minute talk with Mr. Orozco about a Time Clock issue and what to eat for lunch. Ex. 1, 366: 6—11; 25; 367:1-2;393: 2; 8-12. There is no evidence that the contact was based on sex. The contact was not severe or pervasive, it occurred on one occasion, it was neither threatening nor humiliating (at least from an objective standpoint), and there is no record evidence it interfered with Mr. Lee's job performance. Ex. 1, 392:18-23. The conduct alleged does not support an objectively reasonable belief that it was sexual harassment and Mr. Lee has not demonstrated *a good faith, reasonable belief* the School Board was engaged in unlawful employment practices. Mr. Lee's complaint cannot be deemed protected activity in support of a claim of retaliation.

2.   The Acts Complained of Were Not Adverse Actions

"An employment action is considered *adverse* only if it results in some tangible, negative effect on the plaintiff's employment. [A] *materially adverse action* is one that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Garrison v. City of Tallahassee*, 664 F. App'x 823, 827 (11th Cir. 2016) (E.S). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Martin v. Eli Lilly & Co.*, 702 F. App'x 952, 956 (11th Cir. 2017). The acts complained of fail to satisfy the second element of a retaliation claim because they: (a) did not occur; and/or (b) did not result in tangible, negative effects on employment nor dissuade him from making or supporting a charge of discrimination.

First, Mr. Lee alleges Ms. Pierre created a hostile work environment that interfered with his job performance ("**Action 1**"). Specifically, Mr. Lee alleges Ms. Pierre spread rumors that he was permanently moved to the Belle Glade facility, crossed his name off a list for a mid-day shift opportunity, "rudely" instructed him to speak with Mr. Mosley about his Frontier Elementary route, and told other employees to file complaints against him. Ex. 1, 407: 8-25; 408: 1-9; 411: 8-13; 17-22; 412:21-25; 413: 1-5;9-10;19-25; 414:1-5; 417:2-4; 22-24. "Although Title VII protects against forms of retaliation that produce an objective injury or harm, it does not protect against normal petty slights, minor annoyances, and simple lack of good manners." *Manly v. Dekalb County, Georgia*, 587 Fed.Appx. 507, 512 (11th Cir. 2014).

Even if these acts occurred (which is denied), Mr. Lee was not dissuaded from making a charge or an internal retaliation complaint. The evidence demonstrates throughout his employment, from September 2015 through November 2018, he accused employees[11] of hostile work environment, retaliation and filed Charges of Discrimination thereafter in late 2019. Lee Dep. Ex. 4.

 **Second**, Mr. Lee claims being sent to Belle Glade for approximately 16 days was adverse. The evidence demonstrates he was sent to Belle Glade during an investigation into four complaints against him in November and December 2017 by co-workers, a student, and school administrator ("**Action 2**"). Ex. 1, 174, 14-22; 175:17-19; Ex. 1 at Ex. 13. The Belle Glade transfer lasted 16 days, was *de minimis*, and did not cause a tangible, negative effect on his employment.

 **Third**, he claims he was transferred to "sit" in the Maintenance and Plant Operations Department ("M & PO") ("**Action 3**"). Mr. Lee was transferred because of the Western Pines Incident. At first, he was sent home with pay during the investigation and then, later, he was moved to work out of M & PO while the investigation was completed. SUMF, ¶68; Ex. 1, 281: 5-13; 287:20-22; 314:15-22; 315:4-10; 16-22; 316:17-19; 318:7-11:19; Ex. 1 at Ex. 22, Ex. 23, Ex. 28. Mr. Lee was paid for the entire time that he was assigned home and when he was later transferred to M & PO and there is no evidence he suffered a tangible, negative effect on his employment.

 **Fourth** and finally, Mr. Lee claims being told "to sit" and not drive in early November 2018 ("**Action 4**") was adverse. The evidence demonstrates Mr. Lee was unable to drive a bus safely and admitted to several people that he could not move his foot from the gas to the brake. Mr. Lee was also under investigation yet again for alleged threats he made to a Risk employee. SUMF, ¶73, ¶75; There is no evidence that he suffered a tangible, negative effect on his employment.

  3. There Is No Causal Connection between the Protected Activity and Adverse Actions and the School Board has demonstrated Legitimate, Non-retaliatory reasons for the decisions.

 Mr. Lee fails to proffer a single piece of evidence establishing "but-for" his sexual harassment complaint in September 2017, he would not have suffered the alleged Four Actions. To establish a causal connection, "[a]t a minimum, a plaintiff must show that the adverse action followed the protected expression." *Griffin v. GTE Fla., Inc.,* 182 F.3d 1279, 1284 (11th Cir.

---

[11] During his employment, he accused the following employees of retaliation: Carol Stewart Martin, a Transportation HR Investigator, Lydia Sanchez, a Transportation Area Manager, Dianna Weinbaum, former Director of Professional Standards, Mr. Searchwell, Director of Transportation beginning in 2018. **Ex. 11**, 60: 23-25; 61:1

1999).

"A plaintiff must demonstrate that "[his] protected activity was a but-for cause of the alleged adverse action by the employer." *Garrison,* 664 F. App'x at 827. (citing *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)). In other words, a plaintiff must prove that had he not [engaged in the protected conduct], he would not have been fired." *id*. (citing *Jefferson*, 891 F.3d at 924). "When [the] alleged retaliatory conduct was the same continuous harassment that gave rise to the initial complaint, no action will lie unless, after he filed the initial complaint, "[t]here was [a] ratcheting up of the harassment." *Griffin,* 182 F.3d at 1284.

In the case *sub judice*, the record evidence demonstrates there is ZERO connection between Mr. Lee's sexual harassment complaint and the four actions he claims demonstrate retaliation. As to **Action 1,** Mr. Lee's admits having no personal knowledge Ms. Pierre took any of the alleged actions he claims created a hostile work environment. Ex.1, 407: 8-25; 408: 1-9; 411: 8-13; 17-22; 412:21-25; 413: 1-5;9-10;19-25; 414:1-5; 417:2-4; 22-24. If there is no evidence these acts occurred there can be no causal connection. As to **Action 2**, there is no causal connection between the Belle Glade transfer and his sexual harassment complaint. The uncontroverted evidence demonstrates he was transferred because he was under investigation for several unrelated complaints including the Frontier Elementary Incident. SUMF, ¶66; Ex. 5, 221: 17-20; Mr. Lee had already had issues at the East and Central facilities, so the decision was made to send him to Belle Glade for approximately 16 days. Ex. 1, 23: 21-25; 24: 1-9; 111:16-19; 112:10-23; Ex. 1 at Ex. 6; Ex. 11, 158: 14-17; 161: 15-23.

As to **Action 3**, the evidence demonstrates the transfer to M & PO was because Mr. Lee was under investigation <u>again</u> in February 2018 for the Western Pines Incident. SUMF, ¶68-70; Ex. 1: 315: 4-10; Ex. 27.  There is no evidence of any connection between his sexual harassment complaint and transfer. Ex. 1, 281: 5-13; 287:20-22; 314:15-22; 315:4-10; 16-22; 316:17-19; 318:7-11:19; Ex. 11, 72: 4-8; 73: 5-15; 168:14-18; Ex. 1 at Ex. 22, Ex. 23, Ex. 28. As to **Action 4**, the evidence demonstrates Mr. Lee was under investigation for alleged misconduct towards the adjuster, staff at MDNow, and threats allegedly made to an employee in the Risk Department, all of which occurred during the worker's compensation claim investigation in the end of October 2018. His admissions of being unable to drive were also being investigated. Ex. 1, 533: 18-25; 534:1-8; 538:8-20; 541:5-10; Ex. 1 at Ex. 45, Ex. 46, Ex. 47. There is ZERO evidence connecting the sexual harassment complaint to the November 2018 instruction that he not drive.

Finally, the uncontroverted record evidence demonstrates Mr. Lee was terminated because he failed the state mandated dexterity test and for no other reason. SUMF, ¶3; Ex. 1, 391:16-21; 570:17-20; Ex. 2, 180-181; 182:7-10. Nonetheless, as a matter of law, there is no causal connection between the September 2017 complaint and the January 2019 termination. "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *McCray v. Wal-Mart Stores, Inc.*, 377 F. App'x 921, 924 (11th Cir. 2010). *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) (A three-month period between protected conduct and alleged retaliatory action does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.") *see also Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1339 (S.D. Fla. 2012) (Finding 3-month disparity insufficient as a matter of law to demonstrate causal connection on retaliation claim.) Mr. Lee's claim fails because he has not adduced a single piece of record evidence of causation. "So long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." *Vessels,* 408 F.3d at 770, (*citing Burdine,* 450 U.S. at 258, 101 S.Ct. 1089); *Daniel v. Dekalb Cty. Sch. Dist.*, 600 F. App'x 632, 636 (11th Cir. 2014). In short, Mr. Lee has failed to provide evidence showing that the School Board would not have fired him but for his internal EEO Complaint. The uncontroverted record evidence demonstrates that Actions 2, 3 and 4 were decisions based on legitimate, non-retaliatory reasons. There is no evidence that Action 1 ever occurred.

C.   Summary Judgment is appropriate on Count I against Ms. Pierre because Mr. Lee did not suffer a battery and no reasonable jury would return a verdict in his favor.

One "may be liable for battery under Florida law if: (a) [she] acts intending to cause a harmful or offensive contact with the person of the other …; and (b) an offensive contact with the person of the other directly or indirectly results." *Rubio v. Lopez*, No.8:09-cv-1652, 2011 WL 398021, *8 (M.D. Fla. Feb. 2011) (Granting summary judgment to defendant on battery claim). "Where a reasonable [wo]man would believe that a particular result was substantially certain to follow, [she] will be held in the eyes of the law as though [she] had intended it…[h]owever, the knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent." *Id*. Under Florida's sovereign immunity statute 768.28, School Board employees are immune from suit in their personal capacity for discretionary actions taken within the scope of their official authority. *F.S. 768.28(9)(a).*

This statutory immunity may be pierced only where a state official either: (1) acts outside the scope of his employment; or (2) acts "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, [or] safety..." *Id.*

In this case, the evidence demonstrates Ms. Pierre did not have the requisite intent to harm or offend Mr. Lee when she touched his shoulder and put her arm around his back. SUMF, ¶¶76, 77.   Ms. Pierre intended to joke with Mr. Lee because she though he was joking with her *Id*. Ex. 1, 369:3-15; 370: 1-3; 371:15-25; 372: 1-5; 373:11-25; 374:2-11; 375; 379:16-22. Although Mr. Lee claims he was "very offended" by the contact he fails to articulate how the contact harmed or offended him or why he believed it was sexual. Ex. 1 at 374. Mr. Lee claims the contact would somehow be appropriate, not sexual, and less offensive if it occurred between him and a co-worker and the mere fact Ms. Pierre was a supervisor is the reason he was offended. *id*. at 375. A reasonable person in Ms. Pierre's position would not have known that touching Mr. Lee's shoulder to get his attention was offensive or harmful. The witness, Mr. Orozco, was so underwhelmed by the interaction he turned away and continued to work on payroll. Ex. 10, 15-17. In fact, after the interaction, Mr. Lee carried on a 10-minute conversation about the Time Clock and lunch, appearing completely unfazed. Ex. 1, 365:23-24.

Even considered in a light most favorable to Mr. Lee, there is no evidence demonstrating Ms. Pierre intended to commit battery, no evidence suggesting Ms. Pierre intended to hurt Mr. Lee, and no evidence Mr. Lee was harmed. Finally, Mr. Lee has failed to adduce a single piece of evidence to demonstrate Ms. Pierre acted outside the scope of her employment or acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights or safety and, therefore, there is no basis to pierce the statutory sovereign immunity and hold Ms. Pierre personally liable. [12] Simply put, no reasonable jury would believe a battery occurred or return a verdict in Mr. Lee's favor and, therefore, Ms. Pierre is entitled to summary judgment on Mr. Lee's claim for civil battery.

---

[12] "The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a) (2011).

## V.     <u>CONCLUSION</u>

There are no genuine issues of material fact that Mr. Lee did not suffer disability discrimination, retaliation, or battery and both the School Board and Tammy Pierre are entitled to Summary Judgment as a matter of law.

### <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on November 20, 2020, the foregoing document was filed via CM/ECF on all counsel or parties of record on the Service List below.

The School Board of Palm Beach County, Florida
Shawntoyia Bernard, Esquire, General Counsel

By: ***Lisa Kohring***
LISA M. KOHRING ESQ.
Florida Bar No. 93781
SEAN FAHEY, ESQ.
Florida Bar No. 0101083
Office of General Counsel
3300 Forest Hill Boulevard, Suite C-331
West Palm Beach, Florida 33406
Tel: (561) 434-8750
Fax: (561) 434-8105
lisa.kohring@palmbeachschools.org
sean.fahey@palmbeachschools.org
patricia.naval@palmbeachschools.org
mary.quesada@palmbeachschools.org

**<u>SERVICE LIST:</u>**
Henry A. Seiden, Esq.
Seiden Law
6274 Linton Boulevard, Suite 103
Delray Beach, FL 33484
service@beentherewonthat.com