UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-81631-RLR

BRIAN LEE,

      Plaintiff,

v.

TAMMY PIERRE, and
THE SCHOOL BOARD OF
PALM BEACH COUNTY,

      Defendants.

_____/

**REPORT AND RECOMMENTION ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [ECF No. 204]**

By his Third Amended Complaint, Brian Lee brings (1) a claim for battery
against Tammy Pierre (Count I) and (2) claims for unlawful termination (Counts II-
III) and retaliation against the School Board (Counts IV and V). Defendants move
for summary judgment on all counts.[1]

## I.      SUMMARY JUDGMENT

Summary judgment is authorized only when the moving party establishes that
"the pleadings, depositions, answers to interrogatories and admissions on file,
together with the affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law."
*See* Fed. R. Civ. P. 56(c); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). When

---

[1] Counts III and VI-XI of the TAC were previously dismissed.  ECF No. 124.

evaluating a summary judgment motion, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Adickes*, 398 U.S. at 157.

The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must initially "present[]evidence which, if uncontradicted, would entitle it to a directed verdict at trial." *Walker v. Darby,* 911 F.2d 1573, 1576 (11th Cir. 1990) (citation omitted). Then, "Federal Rule of Civil Procedure 56(e) shifts to the non-moving party the burden of presenting specific facts showing that such contradiction is possible." *Id.*

The method by which the moving party can meet its initial burden depends on whether the movant or the non-movant would bear the burden of proof at trial on the underlying legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "[F]or issues on which the movant would bear the burden of proof at trial, 'that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). In contrast, where, as here, the movant does not bear the burden of proof at trial, it "'is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility.'" *Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2561364, at *1 (S.D. Fla. May 20, 2020)

2

(J. Singhal) (citations omitted).  Instead, it merely must point out "an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.  If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels,* 941 F.2d at 1437–38.

If the moving party meets its initial burden, the non-moving party "may not rest upon the mere allegations or denials in its pleadings." *Walker,* 911 F.2d at 1576. Rather, it must "make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693 JB v. Capri of Palm Beach, Inc.,* 932 F. Supp. 1444, 1446 (S.D. Fla. 1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (J. Moreno), *aff'd sub nom. Certain Underwriters v. Capri,* 128 F.3d 732 (11th Cir. 1997).

An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party." *Miccosukee Tribe of Indians of Fla. v. United States,* 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson,* 477 U.S. at 247–48). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the

[non-moving party]." *Anderson*, 477 U.S. at 252.  A self-serving and uncorroborated affidavit can create a genuine dispute of material fact (*United States v. Stein,* 881 F.3d 853, 858 (11th Cir. 2018)), but "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo,* 903 F.3d 1207, 1213 (11th Cir. 2018).

 "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

In sum, Defendants must first offer facts, viewed in the light most favorable to Mr. Lee, (or note the absence of facts) sufficient to show that Defendants would be entitled to judgment as a matter of law.  If Defendants do so successfully, Mr. Lee bears the burden of producing additional undisputed evidence that shows either (1) Defendants are not entitled to judgment at this stage or (2) there is a disputed issue of material fact.

Federal Rule of Civil Procedure 56 and Local Rule 56.1 set forth the procedures for pleading (and responding to) a Motion for Summary Judgment. Rule 56(c) states:

> **(1) Supporting Factual Positions.** A party asserting that a fact . . . is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

Fed. R. Civ. P. 56(c). The Court has discretion to disregard a factual assertion or dispute that is not properly supported by admissible evidence. Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c), (d).[2] A factual assertion that is not properly disputed may be deemed admitted "provided that: (i) the Court finds that the material fact is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. Fla. L.R. 56.1(c).

## II.    PRELIMINARY ISSUES

Mr. Lee objects to the Defendant's Statement of Material Facts because he claims it exceeds Local Rule 56.1's 10-page limit.  L.R. 56.1(b)(1) ("[T]he Statements of Material Facts shall: (A) Not exceed ten (10) pages.").  Defendants' pleading titled "Statement of Undisputed Material Facts In Support of Defendant's Fully Dispositive Motion for Summary Judgment" (ECF No. 205 (hereinafter "DSOF")) comprises 11 pages, with five lines of text on the 11th page.  After accounting for the pleading's caption, signature block, certificate of service, and section headings, the 76 numbered

---

[2] As the Seventh Circuit aptly pointed out, ""Judges are not like pigs, hunting for truffles buried in briefs." *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

paragraphs of asserted facts constitute less than 10 pages.  Mr. Lee's objection is denied.

Mr. Lee further objects to the following statement in footnote 2 of the DSOF: "The School Board and Ms. Pierre accept these facts as true for purposes of this Motion for Summary Judgment, only."  Mr. Lee argues that this "qualifier itself creates a genuine issue of material fact as to all Defendants' facts nos. 1-76 that precludes summary judgment based on qualified facts that Defendants otherwise dispute."  ECF No. 259 at 1.  Mr. Lee cites no authority for this proposition, nor do Defendants cite any authority that they have the ability to qualify their Statement of Material Facts in this way.  Whatever legal effect (if any) that footnote 2 may have at other stages of the proceedings, it does not create a genuine disputed issue of fact at the summary judgment phase.  Moreover, I have confirmed that there is evidentiary support in the record for each factual assertion in the DSOF that forms a basis for this Report and Recommendation.

Defendants' Statement of Facts proffers evidence (much undisputed) about medical episodes that Mr. Lee did not report to the School Board.  *See* DSOF ¶¶ 25–29, 31–33.  To the extent this evidence is offered to show that Mr. Lee submitted false medical reports to the School Board, that inference is not relevant or proper at the summary judgment stage.  Moreover, this evidence is not relevant to whether Mr. Lee was "regarded as" disabled; that determination can only be based on what was known to the relevant decisionmakers, not on what was concealed from them.  The episodes in June 2018, September 2018, and November 2018 post-date Mr. Lee's May

21, 2018 dexterity test and (in part) the July 2018 medical examination; therefore, they are relevant to whether in January 2019 Mr. Lee was a qualified individual under the ADA and to whether the December 2018 dexterity test was pretextual. *See* DSOF ¶¶ 35-37.

### III.    UNDISPUTED FACTS[3]

1.    Brian Lee was a bus driver employed by the School Board between March 2015 and January 2019.  DSOF ¶ 1.

2.    Mr. Lee was initially assigned to work at the East Transportation facility but after altercations with coworkers, he was transferred to the Central Transportation facility and eventually to Royal Palm Transportation facility as of August 2016. DSOF ¶ 2.

3.    Shane Searchwell has been the School Board's Director of Transportation since August of 2018. DSOF ¶ 3.

4.    Tammy Pierre has been an employee of the School Board for 20 years. DSOF ¶ 4.  Ms. Pierre is a Senior Coordinator in the School Board's Transportation Department. She worked in the Royal Palm Transportation facility for 15 years. She currently works at the Belle Glade "West" Transportation facility. As a Senior Coordinator,  Ms. Pierre supervises Coordinators and Bus Drivers. DSOF ¶ 5.

---

[3] Mr. Lee's initial Response to Defendant's Statement of Material Facts (ECF No. 230) included additional facts but did not number them sequentially, as required by Local Rule 56.1(b)(2)(D). It also exceeded the allowable page limit.  After Defendants filed their Reply (ECF No. 252 ("Reply DSOF")), I struck Mr. Lee's Response.  ECF No. 255.  Mr. Lee subsequently filed a corrected Statement of Material Facts.  ECF No. 259 ("PSOF").  I did not require the Defendants to file a new Reply.  For purposes of this motion, I have correlated the relevant paragraphs of the Reply DSOF to the paragraphs from ECF No. 230 that are included in the PSOF.

5.     Gary Mosley has been a Team Leader in the School Board's Transportation Department since 2016. As a Team Leader, Mr. Mosley supervises Senior Coordinators who themselves supervise Coordinators and Bus Drivers. DSOF ¶ 6.

6.     As a bus driver, Mr. Lee was required to pick up and transfer students to and from school. DSOF ¶ 7.

7.     He was also responsible for maintaining safe driving including, but not limited to, being accident free and keeping passengers safe. DSOF ¶ 8.

8.     Generally, drivers can pick up a total of four separate shifts in a day; a morning shift, afternoon shift, mid-day shift, and an activity. DSOF ¶ 9.

9.     The morning shift runs from 5:00AM through 10:00AM and the afternoon shift runs from 1:15PM through 5:30PM. DSOF ¶ 10.

10.    The mid-day shifts run from 10:00AM through 11:45AM usually to transport students on field trips or pick up kindergarteners who only go to school for half a day. DSOF ¶ 11.

11.    Activities begin between 5:30 and 6:00PM and last about two hours during which the bus driver picks up and transfers students to and from afterschool activities. DSOF ¶ 12.

12.    Mr. Lee drove morning and afternoon shifts every day and he drove an activity four days a week. DSOF ¶ 13.

13.    There are various rules that bus drivers are supposed to follow. Drivers are not supposed to idle the bus for health reasons. Idling is when the bus is parked

and the engine is on. It is a health concern because the bus is in close proximity to children and others in the bus loop and fumes can get into the lungs of the children. DSOF ¶ 14.

14.     Operating a school bus by picking up and dropping off students is an essential function of the Bus Driver position. DSOF ¶ 16.

*Dexterity Testing*

15.     The Florida Department of Education through the Director of School Transportation Management is in charge of managing the 67 school districts in Florida to ensure the districts comply with the Florida Administrative Code and Florida Statutes regarding safety of school transportation. DSOF ¶ 17.

16.     The Florida Administrative Code 6A-3.0141 mandates the School Board assure bus drivers possess licensure qualifications and meet specific physical fitness qualifications, such as: possessing a valid CDL, being physically capable of operating a vehicle as determined by a physical examination in accordance with 49 C.F.R. § 391.41(b), as evidenced by the Medical Examiner's Certificate, and as determined by a dexterity test administered by the school district at least annually. DSOF ¶¶ 15, 18.

17.     Florida Administrative Code Rule 6A-3.0141 governs dexterity testing for school bus drivers.  The Rule in effect in December 2018 stated in relevant part:

(3)  Prior to transporting students on a school bus each operator shall meet the following requirements:

. . .

(d)   Be physically capable of operating the vehicle as determined by a physical examination . . . and as determined by a dexterity test administered by the school district.  Form MCSA-5876 (effective March 2016) is incorporated by reference (http://www.flrules.org/Gateway/reference.asp?No=Ref-06476) and may be obtained from the School Transportation Management Section, Florida Department of Education, 325 West Gaines Street, Tallahassee, Florida 32399. The school district shall report dexterity results on Form ESE 480, Dexterity Test for School Bus Driver (http://www.flrules.org/Gateway/reference.asp?No=Ref-06477) (effective March 2016), which is incorporated in this rule by reference.

18.   In connection with Rule 6A-3.0141, the Florida Department of Education requires that school districts report the results of the dexterity test administered to bus drivers on Form ESE480.

19.   The dexterity test includes five steps intended to determine whether the driver can physically handle the bus, exit the bus, and make sure the driver is physically capable of evacuating students in the event of an emergency. DSOF ¶ 20.[4]

20.   In October 2006, the Florida Department of Education circulated Recommended Guidelines for Administering Dexterity Test to all school districts. ECF No. 259-8 at 43–44, 81–85.

21.   The FDOE Guidelines provide: "The operator shall be afforded every opportunity to demonstrate the ability to pass all components of the dexterity test." ECF No. 259-8 at 82.

---

[4] The evidence cited by Defendants supports this proposition. Mr. Lee responds, "Disputed.  Gout and kidney problems are related due to Plaintiff's chronic uric acid neuropathy."  PSOF ¶ 20 (citing Dr. Gemayel deposition).  The evidence cited by Mr. Lee does not create a factual dispute with Defendants' asserted fact.

22.     The FDOE Guidelines do not prohibit a driver from using the handrail to go from the ground to the first step on the bus stairs.  ECF No. 259-11 at 56, ECF No. 259-8 at 30.

23.     Palm Beach County administers its dexterity tests pursuant to Rule 6A-3.0141 and Form ESE 480.  It does not adopt the FDOE Guidelines.  ECF No. 259-3 at 25–49, 61–62, 65–69.

24.     FDOE gives the School Board discretion in how it administers a dexterity test. DSOF ¶ 21.[5]

25.     In March 2015 at the onset of employment, Mr. Lee filled out an Applicant Medical/Health History form certifying he did not suffer from health conditions preventing him from performing the job. Mr. Lee represented on the form that he did not suffer from any health conditions including kidney conditions. He disclosed gout but did not list any medications or hospitalizations. The medical doctor who evaluated Mr. Lee pursuant to CFR 391.41 identified his gout under the Physical Examination section but stated: "gouty tophi bilat hands but full range of movement + no interference of driving." DSOF ¶ 22; ECF No. 206-1 at 609.

26.     In April 2016, Mr. Lee completed the Post Job Offer Medical History Questionnaire and disclosed gout on the form but did not list any medications or hospitalizations. DSOF ¶ 24.

---

[5] The evidence cited by Defendants supports this proposition.  Mr. Lee responds, "Disputed.  Gout and kidney problems are related due to Plaintiff's chronic uric acid neuropathy. Plaintiff disclosed his gout to the School Board beginning with employment in March 2015 and subsequent thereto.  Plaintiff notified the School Board that he was medicated with Uloric and Colchicine." PSOF ¶ 21. The evidence cited by Mr. Lee supports the facts he asserts but does not create a factual dispute with Defendants' asserted fact.

27.     Every year thereafter from 2016–2018, Mr. Lee submitted himself to annual DOT physical evaluations and filled out a Post Job Offer Medical History Questionnaire certifying he did not suffer from any health conditions including kidney conditions. Each time he filled this paperwork he was obligated to disclose health conditions that could impact his ability to drive a bus and the days he had been absent from work because of an illness. Mr. Lee never disclosed absences from work because of gout or kidney issues and never mentioned having a disability. He had several opportunities on the paperwork to disclose his need for an accommodation; he never did so. DSOF ¶ 23.

28.     In a Medical Examination Report Form dated May 1, 2017, Mr. Lee disclosed he was taking the following medications: "Colercine/Uloric." ECF No. 206-1 at 622.[6] The Medical Examination Report Form referenced "significant tophi with R hand weakness on grip test, very deformed gouts on hands due to arthritis. Non tender." *Id.* at 625. Again, Mr. Lee represented he had no health conditions including kidney conditions.   On the Post Job Offer Medical History Questionnaire he represented he did not suffer from any health conditions including kidney conditions; he did not disclose his gout, nor did he disclose his hospitalizations. DSOF ¶30.[7]

---

[6] Mr. Lee alleges, "During employment, Plaintiff disclosed to the School Board that he had a chronic gout condition and that he took Uloric and Colchicine as medications for that condition." PSOF ¶ 96. The School Board disputes that Mr. Lee disclosed a chronic gout condition. Reply DSOF ¶ 21. The sole evidence cited by Mr. Lee in support of this proposition is the May 1, 2017 Medical Examination Report, which only lists the two medications without reference to gout or a chronic condition. Mr. Lee's cited evidence does not substantiate his factual assertion.

[7] Mr. Lee responds, "Disputed. Plaintiff listed Uloric and Colchicine on the forms. Gout and kidney problems are related due to Plaintiff's chronic uric acid neuropathy." PSOF ¶ 30. This assertion does not contradict the School Board's proffered facts.

29.     On May 21, 2018, Mr. Lee submitted for his annual DOT Medical Examination. ECF No. 206-1 at 668. The Medical Examination Report Form referenced "gouty tophi on both hands with full ROM + strength." *Id.* at 674.  The form noted high blood pressure but the medical doctor cleared him with a 3-month certification that expired on August 21, 2018.   Mr. Lee swore he had no kidney problems and no chronic diseases.  *Id.* at 673.  He did not list "gout" under "Other health condition(s) not described above."  *Id.*  The signature jurat stated, in part, "I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate." *Id.*

30.     As part of the 2018 medical examination, Mr. Lee also filled out the Post Job Offer Medical History Questionnaire.  *Id.* at 676.  He swore that he had no kidney or bladder trouble, no arthritis or rheumatism, and no joint trouble/injury.  *Id.*  He stated he had not been treated for any condition or diseases within the past 3 years, had never been hospitalized, and was not taking any prescription drugs.  *Id.* at 677.

31.     Mr. Lee passed a dexterity test on May 21, 2018.  ECF No. 259-10 at 95. Those test results were valid for 13 months.  *Id.*

32.     Into June 2018, Mr. Lee continued to have severe pain in his knees, but he never told anyone at the School Board about his pain, his condition, or his hospitalizations. DSOF ¶ 35.[8]

---

[8] Without citation to the record, Mr. Lee states, "Disputed pain was severe. No documentation available." PSOF ¶ 35.  Defendants cite to deposition testimony where Mr. Lee admitted he "had been experiencing in June of 2018 severe knee pain."  ECF No. 206-1 at 184. The assertion in the DSOF is not genuinely disputed.

33.     Mr. Lee received a Medical Examiner's Certificate from MDNow on July 18, 2018, that was valid until May 21, 2019.  ECF No. 259-10 at 94.

34.     Again in September 2018, Mr. Lee reported to TotalMD for a gout flare up in his right knee.[9]  ECF No. 206-1 at 185–86; 565–66.

35.     On the afternoon of October 16, 2018, Mr. Lee reported to School Board Tech Transportation Specialist Jack Orozco that he had banged his knee on the steering column of a school bus while on duty that day. ECF No. 259-10 at 12–13. ECF No. 259-6 at 26.[10]

36.     Mr. Lee made a worker's compensation claim with the injury date being October 16, 2020.  PSOF ¶ 90.

37.     A video from Mr. Lee's bus on October 17 shows Mr. Lee moaning in pain. He calls the dispatcher and states "I'm having trouble operating the vehicle. My knee is not working. I need a replacement driver." ECF No. 198, Ex. 2 (video under seal). Mr. Lee did not tell the dispatcher that he suffered a worker's compensation injury. ECF No. 206-1 at 235–36.[11]

---

[9] Defendants also assert, "Mr. Lee never told anyone at the School Board about the pain he was having in his knee in September 2018."  DSOF ¶ 36.  Mr. Lee responds (citing his own deposition), "Disputed. Plaintiff does [not] recall if told anyone at School Board or not." PSOF ¶ 36.  Although Mr. Lee's lack of recollection does not create a genuine factual dispute, the evidence cited by the School Board does not support the assertion that Mr. Lee never told the School Board about this gout flare up.

[10] The parties dispute whether the injury occurred on October 16 or 17. The School Board does not have a video of Mr. Lee's bus from October 16. Mr. Lee has moved for spoliation sanctions.  ECF No. 201.  For purposes of the motion for summary judgment, the evidence must be viewed in the light most favorable to Mr. Lee, so I will treat the injury as having occurred on the 16th. Therefore, even assuming *arguendo* that the School Board failed to properly preserve the October 16 video, there is no prejudice to Mr. Lee at this stage.  Regardless, the difference in date is not material to the issues before me.

[11] Mr. Lee states (with record citations): "Disputed. Mr. Lee does not know video retention process. The workers comp injury happened on October 16, 2018." PSOF ¶ 41. This evidence does not create a genuine factual dispute about whether Mr. Lee notified the dispatcher that he suffered a worker's

38.     In the video, Mr. Lee uses his hand to pick up his right leg to move it from the gas pedal to the brake. ECF No. 206-1 at 233–35; DSOF ¶ 42.[12]  The right leg is the leg used to brake and bring the bus to a stop.  ECF No. 206-1 at 233–35; DSOF ¶ 43.  Having trouble moving one's leg from the gas pedal to the brake presented a safety issue for driving a school bus. DSOF ¶¶ 44, 45; ECF No. 206-1 at 527.

39.     On or about October 26, Mr. Lee told the workers compensation adjuster that he had trouble moving his leg from the pedal to the brake. He also told the adjuster that the MDNow doctor told him on October 23 that he could not be released back to work because it would not be safe. Mr. Lee said he did not agree with the doctor's assessment.  ECF No. 206-1 at 239, 567–68.[13]

40.     In a Florida Worker's Compensation Uniform Medical Treatment report (Form DWC-25) dated October 26, 2018, School Board worker's compensation physician Long Tran M.D. determined that Mr. Lee had no functional limitations or restrictions, that he had achieved maximum medical improvement, and that no future medical care was anticipated.  ECF No. 259-1 at 3.

41.     On October 26, 2018, Mr. Lee notified Mr. Orozco that MDNow had released Mr. Lee to return to work. That same day, Mr. Orozco notified the School

---

compensation injury.  In his deposition, Mr. Lee testified that he did not recall if he gave this information to the dispatcher. ECF No. 206-1 at 236.

[12] In response to DSOF ¶¶ 42-44, Mr. Lee states (with record citations): "Disputed. The seat was not functioning correctly." PSOF ¶¶42–44. This fact does not create a genuine dispute with the School Board's asserted facts.

[13] Mr. Lee states, "Disputed. Plaintiff released without restrictions and cleared to return to work." PSOF ¶ 40. He cites his own affidavit and a Form DWC-25 dated October 26 which stated there were "No functional limitations identified or restrictions prescribed" as of October 26, 2018.  ECF No. 259-1 at 3.  This evidence does not create a genuine factual dispute about what Mr. Lee told MDNow on October 23.

Board risk management personnel that Mr. Lee was medically cleared to return to work. ECF No. 259-6 at 28–32, 52.[14]

42.   Mr. Lee provided Mr. Orozco with a copy of the Form DWC-25 from MDNow dated October 26, 2018.  ECF No. 259-1 at 1.  That document noted "No functional limitations identified or restrictions prescribed as of" October 26, 2018.  *Id.* at 3.

43.   On October 29, 2018, Mr. Lee's worker's compensation claim was denied by the Florida Department of Financial Services, Division of Workers' Compensation. The reasons for denial were: "(1) The work performed is not the major contributing cause for seeking further medical treatment, (2) The claimant [sic] medical condition is pre-existing and 90% for the need of medical treatment.  Claimant is to seek continuing care under his own personal health insurance."  ECF No. 231-10 at 91; Reply DSOF ¶ 19.

44.   On or about October 29, Mr. Lee returned to the transportation facility to provide the necessary paperwork to Mr. Orozco, who was also involved in administrative functions related to workers' compensation claims. ECF No. 206-1 at 244, 569.[15]

---

[14] The School Board states, "The testimony identified is inadmissible hearsay. Nevertheless, this does not create a genuine issue of material fact." Reply DSOF ¶ 18. I cannot conclude at this juncture that the evidence is inadmissible hearsay. The information conveyed by Mr. Lee to Mr. Orozco, and by Mr. Orozco to others, may be admissible non-hearsay to show that people were on notice of certain facts and/or why they took other subsequent actions.

[15] The School Board also asserts that Mr. Lee told Mr. Orozco on or about October 29 that he could not walk.  DSOF ¶ 46.  The record evidence cited in support of this assertion shows that Mr. Lee made this statement to Mr. Orozco at some point, but does not establish that it occurred on or about October 29. ECF No. 206-1 at 587-88.  During his deposition, Mr. Lee testified that he did not recall making

45.     In November 2018, Mr. Searchwell learned that Mr. Lee was having trouble moving his legs and feet from the bus's throttle to its brake. Mr. Searchwell was concerned that this situation presented a possible safety risk. He recommended that Mr. Lee undergo a dexterity test to determine whether he was safe to operate a school bus. ECF No. 259-3 at 24–26; 32–33, 90–91, 233, 237.

46.     Jodi Cummings and Sue Gorby were tasked with administering the dexterity test to Mr. Lee. Ms. Cummings is the School Board's Chief CDL Tester, Senior Coordinator and Safety and Training Specialist in Transportation. Ms. Gorby is a former employee of the School Board; she worked as a bus driver, transportation coordinator, Senior Coordinator, Safety Specialist, and Transportation Specialist. As a Transportation Specialist, Ms. Gorby focused mainly on safety, investigating accidents or accident retrains. DSOF ¶ 49.

47.     Ms. Cummings began performing dexterity tests as a CDL tester for the State of Florida for individuals returning to duty. DSOF ¶ 50.

48.     On November 15, Mr. Lee was asked to take the dexterity test but he refused.  DSOF ¶ 51.[16]

49.     Mr. Lee was again hospitalized via ambulance on November 23, 2018 for gout and pain in his right leg. DSOF ¶ 37.

---

this statement to Mr. Orozco. ECF No. 206-1 at 244–46.  As such, the record does not substantiate the additional fact asserted by the School Board.

[16] In response to DSOF ¶¶ 51–52, Mr. Lee states, "Disputed regarding refusal because the test was taken on December 19, 2018."  He does not cite the record, nor otherwise create a genuine factual dispute about whether he refused to take a dexterity test on November 15, 2018, or November 27, 2018.

50.     On November 27, 2018, Mr. Lee was again asked to take the dexterity test but he refused. DSOF ¶ 52.

51.     On December 3, 2018, Mr. Lee received a letter from the Risk Department notifying him that he had been seen with limited movement and needed to obtain permission from his primary care physician to be cleared to take the dexterity test. He was informed that if he did not take the dexterity test it would be considered an involuntary resignation from employment. DSOF ¶ 53.

52.     On December 14, 2018, Mr. Lee saw his primary care physician Dr. Gemayel, for clearance to take the dexterity test. Dr. Gemayel evaluated Mr. Lee's hand and explained to him that he needed to take medication to reduce the swelling in his hand before he could take the test. He was told that the swelling would likely subside in 7–10 days and thereafter he would be able to take the test. The doctor provided him with clearance on December 14 so Mr. Lee would not have to return after the swelling subsided to obtain the note. DSOF ¶ 54.

53.     On December 19, 2018, Ms. Gorby administered the dexterity test to Mr. Lee. Ms. Cummings was the witness.  ECF No. 206-15 at 5.

54.     The examiners concluded that Mr. Lee failed to successfully complete the first component of the dexterity test – climbing and descending the front steps of a 65-passenger bus or larger without pausing.  ECF No. 259-3 at 274.

55.     The dexterity testers gave Mr. Lee two chances to perform Test Item 1. Gorby failed Mr. Lee the first time Mr. Lee performed Item 1 because he grabbed the handrail and pulled himself onto the step. ECF No. 259-11 at 20–26.  The second time

Mr. Lee performed Item 1, Gorby and Cummings failed him because he paused while descending the stairs and stepped twice on one step. *Id.*; ECF No. 206-13 at 9–11; DSOF ¶ 55.[17]

56.    In the dexterity test, drivers are taught and perform a "three-point stance," to grab the handrails and all drivers have successfully performed dexterity test Item 1 using the handrails. The FDOE Guidelines do not prohibit a driver grabbing the stairwell handrail during a dexterity test.  PSOF ¶ 112; Reply DSOF ¶ 39.

57.    After Mr. Lee failed Test Item 1, the examiners did not administer the four other components of the test, including Test Item 3 – activating the brake pedal with the right foot in ¾ of a second or less after removing the right foot from the throttle pedal.  *Id.;* ECF No. 206-15 at 5.

58.    The School Board's standard practice is to halt the dexterity test if a bus driver fails any of the components. DSOF ¶ 56; ECF No. 206-13 at 12; ECF No. 206-15 at 5.[18]

59.    The test results were recorded on the March 2016 version of Form ESE 480. ECF No. 259-3 at 274.

---

[17] Mr. Lee disputes the description of the dexterity test, citing to the video. PSOF ¶ 55 (citing ECF No. 227, Exs. 31–32) (filed under seal). He argues that there is a jury issue as to whether he failed the test. ECF No. 229 at 5–6. As discussed more fully below, the School Board is entitled to summary judgment on Mr. Lee's claims even if the examiners incorrectly concluded that he failed the dexterity test.

[18] Mr. Lee states that this fact is disputed. He cites anecdotal evidence that some drivers were given multiple chances to pass the dexterity text. *See* PSOF ¶ 56 (citing depositions of Marvin Jackson and Gary Mosley).  Those are two different questions.  Here, the undisputed testimony is that Mr. Lee was given two chances to pass the first component of the dexterity test.  The cited evidence does not contradict that the School Board's standard practice was to not administer the balance of the test if someone failed the first component.

60.     In April of 2016, Mr. Lee was counseled for the first time about the need to communicate with his coworkers in a professional manner. He was counseled because he had several verbal altercations with coworkers at the East Transportation facility in March 2016 in addition to having an altercation with a bus attendant while she was trying to place a handicapped student in a seat. DSOF ¶ 58.[19]

61.     In December 2016, Mr. Lee parked in the wrong parking spot and he responded in a fit of rage, approached the female driver, and raised his hand in close proximity to her face as though he was going to strike because she asked him to re-park. Mr. Lee admitted he held back from engaging in a physical confrontation and received a written reprimand for his misconduct. DSOF ¶ 59.

62.     In May 2017, Mr. Lee was accused of hitting a co-worker with a bathroom stall door; he did not recall if he propositioned the employee to fight in the parking lot and he received a written reprimand for his misconduct. DSOF ¶ 60.

63.     Because of Mr. Lee's behavior towards co-workers, Mr. Lee was sent to the School Board's Mandatory Employee Assistance Program at least three times. DSOF ¶ 61.

64.     On September 22, 2017, Mr. Lee was counseled again by his supervisor, Cynthia Holloman, in connection with concerns of co-workers about Mr. Lee's alleged intimidating and harassing behavior. DSOF ¶ 62.

---

[19] Mr. Lee does not dispute the accuracy of ¶¶ 58-62, but objects under Rule 56(c)(2) on grounds of relevance, materiality, and improper character evidence. This evidence is arguably relevant to whether Mr. Lee is a qualified individual under the ADA and to explain why subsequent measures (such as job reassignment and temporary leave with pay) were implemented. At this stage, the Court does not weigh witness credibility or character for truthfulness, so this evidence will not be considered for those purposes.

65.     On the same day he was counseled by Ms. Holloman, Mr. Lee had an interaction with Ms. Pierre which led him to make a formal charge of sexual harassment against her. ECF No. 206-1 at 44.[20]

66.     Mr. Lee notified Mr. Mosley of the alleged sexual harassment. Mr. Mosley communicated the complaint to the School Board's Office of Professional Standards.  ECF No. 269 at 341–42.  The matter was referred to EEO coordinator Germaine English for investigation.

67.     In November and December 2017, Mr. Lee was the subject of several complaints by co-workers and a School Administrator at Frontier Elementary. DSOF ¶ 65.[21]

68.     On December 21, 2017, Mr. Lee was presented with a letter which stated, "This letter is direction to and/or confirmation of your assignment to a temporary duty location at the West Transportation Facility beginning **January 8, 2018.** This assignment is pending the outcome of an investigation and shall continue until you are notified of a change of assignment in writing."  ECF No. 206-1 at 445 (emphasis in original).  The letter was signed by Pete DiDonato, the Director of the Transportation Services Department. Among the people copied on the letter were Shane Searchwell and Gary Mosley. *Id.*

---

[20] As discussed more fully below, there are conflicting facts about exactly what happened between Mr. Lee and Ms. Pierre.

[21] Mr. Lee states that these facts are disputed, but the record evidence he cites does not contradict the School Board's facts. *See* PSOF ¶ 65.

69.     At some point thereafter, Mr. Lee complained that Ms. Pierre and Mr. Mosley retaliated against him by transferring him to the Belle Glade facility. ECF No. 259-7 at 93–94.[22]

70.     While the complaint against Mr. Mosley was being investigated, he was transferred out of the Royal Palm Beach facility.  ECF No. 259-7 at 94–95.

71.     In an investigative report dated January 8, 2018, Ms. English concluded that the allegation that Ms. Pierre sexually harassed Mr. Lee in violation of Title VII and School Board policy was substantiated. ECF No. 259-4 at 260.   Ms. English also found that Ms. Pierre and Mr. Mosely retaliated against Mr. Lee in violation of School Board policy by transferring him to Belle Glade. *Id.*

72.     At the conclusion of the investigation on February 5, 2018, Mr. Lee returned to the Royal Palm Transportation Facility. DSOF ¶ 66.[23]

73.     Less than 14 days after returning to Royal Palm, on or about February 19, Mr. Lee had another altercation with a bus driver in the bus loop at Western Pines Middle School about idling his bus, and a later altercation with an Assistant Principal (the "Western Pines Incident"). After the incident in the morning with the co-worker, and the incident in the afternoon with the Assistant Principal, the Principal and

---

[22] Neither party has cited evidence showing the date of Mr. Lee's retaliation complaint.

[23] Mr. Lee states that this fact is disputed, but the record evidence he cites does not contradict the School Board's fact. *See* PSOF ¶ 66. Mr. Lee also objects on grounds of relevance, materiality, and improper character evidence. Those objections are overruled. Mr. Lee asserts that his transfer to Belle Glade was an adverse employment action that violated Title VII. The timing and duration of that transfer are relevant and material to the issues before the Court. The asserted fact does not reflect on Mr. Lee's character.

Assistant Principal of the School asked that Mr. Lee not be returned to the Western Pines Route. DSOF ¶ 67.[24]

74.    While the Western Pines Incident was investigated, Mr. Lee was sent home on administrative leave with pay. Mr. Lee was also assigned to attend Mandatory EAP again in connection with the Western Pines Incident. DSOF ¶ 68.

75.    From February 22 through March 8, 2018, Mr. Lee was assigned home with pay during the investigation. DSOF ¶ 69.

76.    Several co-workers reported they were afraid of Mr. Lee. DSOF ¶ 70.

77.    Mr. Lee was also sent to anger management to help him cope with stress. DSOF ¶ 71.

78.    While Mr. Lee was on paid administrative leave for the Western Pines Incident, another complaint came in that Mr. Lee told a co-worker that he carries a weapon in his lunch bag. The School Board immediately halted the Western Pines Investigation to deploy resources to the allegation that Mr. Lee was carrying a gun. The Investigation determined that the claim was unfounded and Mr. Lee was notified that the investigation was being closed. Mr. Lee did not receive any discipline in connection with the allegation. DSOF ¶ 72.

---

[24] Lee does not dispute the facts alleged in DSOF ¶¶ 67–73 but objects to them being considered. He asserts they are irrelevant, immaterial, and improper character evidence. PSOF ¶¶ 67–73. I overrule that objection. Mr. Lee asserts that his assignment to the Maintenance and Plant Operations Department (addressed below) was an adverse employment action. ECF No. 58 ¶ 79. His retaliation claims also allege "he suffered unreasonable interference with his performance." *Id.* This allegation arguably relates to the actions taken in response to the Western Pines Incident. The School Board has argued that Mr. Lee is not a "qualified individual" under the ADA because of his inability to handle work-related stress. These facts are relevant and material to that issue. Because they pertain to issues other than character, they are not improper character evidence. Fed. R. Evid. 404(b).

79.     After the investigation into the Western Pines Incident was resumed, Mr. Lee was assigned to work in the Maintenance and Plant Operations Department ("M & PO"). Mr. Lee worked in M & PO until the end of May, 2018. DSOF ¶ 73.

80.     On October 16, 2018, after reviewing Ms. English's report and conducting predetermination meetings with Ms. Pierre and Mr. Mosley, Dianna Weinbaum, the School Board's Director of Professional Standards, issued verbal reprimands with written notation to Ms. Pierre and Mr. Mosley for violating School Board policy. Ms. Weinbaum did not adopt Ms. English's conclusion that Ms. Pierre's conduct violated Title VII. ECF No. 206-10 at 8–13, 53, 152; PSOF ¶ 87, Reply DSOF ¶ 12.

81.     After the disciplinary proceedings ended, Mr. Mosley was transferred back to the Royal Palm Transportation facility as Mr. Lee's supervisor.[25]

82.     In October and November 2018, the School Board began investigating allegations that Mr. Lee threatened an employee in Risk Management and was unprofessional towards MDNow staff and doctors. ECF No. 206-1 at 574–85; DSOF ¶ 74.

83.     On November 1, 2018, Mr. Lee was given a letter signed by Mr. Searchwell stating that Mr. Lee was under investigation for unspecified unethical misconduct. PSOF ¶ 100; Reply DSOF ¶ 25; ECF No. 259-3 at 386.

---

[25] The record does not reveal the date of the transfer. Also, the parties dispute who made the decision to transfer Mr. Mosley back to Royal Palm Beach. *Compare* ECF No. 259-10 at 23 with ECF No. 259-3 at 148. Given that Mr. Lee filed a complaint against Mr. Mosley on November 13, 2018, alleging that the November 1 investigative notice was retaliatory, it is logical to conclude that Mr. Mosley returned to the Royal Palm Transportation facility between October 16 and November 1.

84.     On November 13, 2018, Mr. Lee lodged a complaint with Ms. English that Mr. Searchwell and Mr. Mosely were retaliating against him by placing him under investigation again. PSOF ¶ 101.[26]

85.     Mr. Searchwell received information that Mr. Lee failed the December 19, 2018, dexterity test; as a result, on January 8, 2019, Mr. Searchwell hand-delivered a letter to Mr. Lee which stated in relevant part, "Your failure to pass this dexterity test has resulted in you not being qualified for your position as a school Bus Driver. Therefore, effective immediately, your employment with the District is terminated. Your name will be submitted as a termination at the next scheduled School Board meeting on January 23, 2019." ECF No. 259-3 at 284.  No other options or accommodations were offered to Mr. Lee. ECF No. 259-10 at 5.

86.     The sole reason given for Mr. Lee's termination was Mr. Lee failing a December 19, 2018 dexterity test administered by the School Board. DSOF ¶ 78; Reply DSOF ¶ 5 (ECF No. 254).

87.     Mr. Lee was not terminated due to being an anger or violence threat. DSOF ¶ 81; Reply DSOF ¶ 7.

---

[26] The parties dispute whether Mr. Searchwell was aware of the complaint. Mr. Lee asserts, "Searchwell recalled receiving a report that Plaintiff made a November 2018 retaliation complaint against Mosley to English."  PSOF ¶ 103 (citing Searchwell deposition, ECF No. 259-3 at 146–47). The School Board responds, "Disputed. There is no admissible evidence supporting this fact." Reply DSOF ¶ 27. The School Board further asserts, "Mr. Searchwell did not know that Mr. Lee complained about him." *Id.* (citing Searchwell deposition, ECF No. 259-3 at 140–42. At best, viewing the evidence in the light most favorable to Mr. Lee, Mr. Searchwell gave inconsistent testimony on this issue. Regardless, for the reasons explained below, because Mr. Searchwell did not make (or unduly influence) the decision to terminate Mr. Lee's employment, his knowledge of the retaliation complaint is not material.

88.     On December 20, 2018, Searchwell drafted a letter addressed to Mr. Lee that was never delivered to Mr. Lee giving him alternative employment options other than termination. PSOF ¶ 117; ECF No. 259-3 at 156.

89.     Searchwell did not have authority to terminate Mr. Lee. ECF No. 259-3 at 16–17.

90.     Termination authority ultimately resides with the Superintendent and the school board. *Id.*

91.     Searchwell recommended to the HR Department, the Risk Management Department, and ultimately the Superintendent of Schools that Mr. Lee's employment be terminated. *Id.* at 17.

92.     No subordinate recommended to Mr. Searchwell that Mr. Lee be terminated. *Id.* at 22–23.

## IV.     DISCUSSION

Mr. Lee asserts five claims in the Third Amended Complaint. Count I alleges battery against Ms. Pierre. Count II alleges "regarded as" discrimination under the Americans with Disabilities Act. Count III alleges wrongful termination under the Florida Civil Rights Act (FCRA). Counts IV and V allege retaliation under Title VII and the FCRA, respectively. The state law claims are analyzed under the same framework as their federal counterparts. *See Wilbur v. Corr. Servs. Corp.,* 393 F.3d 1192, 1195 n.1 (11th Cir. 2004) ("The [FCRA] was patterned after Title VII, and Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII."); *Holly v. Clairson Indus., L.L.C.,* 492 F.3d 1247, 1255 (11th

Cir. 2007) ("[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims.").

### A.    Battery (Count I)

"In Florida, a battery is the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Quilling v. Price*, 894 So. 2d 1061, 1063 (Fla. 2005), cited in *Robinson v. Lambert*, 753 Fed. Appx. 777, 784 (11th Cir. 2018). Battery does not require an intent to cause harm. *Paul v. Holbrook,* 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997).

The Third Amended Complaint alleges:

> 16.    On or about September 22, 2017 within a one-hour period, Tammy Pierre engaged in battery of Plaintiff in the workplace at Board's District Transportation offices through two intentional, unwanted, unwelcome, unconsented physical contacts with Plaintiff which were intended by Pierre, and were perceived by Plaintiff, to be sexually intimate and provocative. During the first occurrence, Tammy Pierre lifted Plaintiff's shirt from Plaintiff to expose him. On the second occasion, Tammy Pierre intimately touched Plaintiff's back and his midsection on the front of his body while blocking his path to a doorway which would have enabled Plaintiff to escape Pierre's unwelcome physical contact.
>
> . . .
>
> 21.    The aforesaid physical contact by Pierre upon Plaintiff was committed in bad faith or with malicious purpose or in a manner exhibiting wanton or willful disregard of Plaintiff's human rights.

ECF No. 58 ¶¶ 16, 21.

In his deposition, Mr. Lee described the incident with Ms. Pierre as follows:

> I was standing in the entrance to Jack's office door into his office.  As I was standing there, Tammy came in.  She proceeded to lift my shirt up off – off my shoulders, telling me it was nice material.  She liked it. Okay. So I tried to move inward because she had my – had the doorway

> blocked. So instead of going into her trying to get out, I went forward
> into Jack's office. After about a couple – 10 minutes she came – Jack
> came back into the office at which time she said, Hey, Jack watch this.
> At which time she sexually harassed me a second time by taking her
> hand, her arm, placing it on my back lower side and then she proceeded
> to go around to the front of me and touch my midsection.

ECF No. 206-1 at 731. Mr. Orozco testified in his deposition that he saw Ms. Pierre

put her hand on Mr. Lee's middle/upper back. He denied seeing Ms. Pierre touch Mr.

Lee's stomach. ECF No. 259-6 at 14–17. Mr. Orozco told English, "I saw Ms. Pierre

touch Mr. Lee with a pat in the back, and then touching his middle while I was in my

office at the Royal Palm compound." *Id.* at 18. Pierre says she tickled Lee on his right

side as a joke. ECF No. 206-6 at 8–9. She testified that Lee turned red and was

laughing. ECF No. 206-6 at 11–12. Although there is conflicting evidence on this

issue, at this stage, I must view the evidence in the light most favorable to Mr. Lee.

Therefore, I accept his version of the events.

The School Board argues that Ms. Pierre lacked the heightened intent

necessary to hold a public employee liable for battery. ECF No. 204 at 20–21. The

School Board invokes sovereign immunity under Florida Statute 768.28(9)(a) to argue

that Mr. Lee must prove that Ms. Pierre acted "in bad faith or with malicious purpose

or in a manner exhibiting wanton or willful disregard of human rights, [or] safety."

ECF No. 204 at 20–21. That statute states in pertinent part:

> No officer, employee, or agent of the state or of any of its subdivisions
> shall be held personally liable in tort or named as a party defendant in
> any action for any injury or damage suffered as a result of any act, event,
> or omission of action in the scope of her or his employment or function,
> unless such officer, employee, or agent acted in bad faith or with
> malicious purpose or in a manner exhibiting wanton and willful
> disregard of human rights, safety, or property.

28

Fla. Stat. § 768.28(9)(a) (2020). Mr. Lee's response to this argument, in full, is:

> Pierre's claim of sovereign immunity is equally frivolous. To that end, "[t]he State of Florida has waived sovereign immunity in tort actions for any act for which a private person under similar circumstances would be held liable." *Henderson v. Bowden*, 737 So. 2d 532, 534-35 (Fla. 1999) (citing Art. X, § 13, Fla. Const.; § 768.28 Fla. Stat. (1995)).

ECF No. 229 at 18. It is not clear whether Mr. Lee disputes that Ms. Pierre can invoke sovereign immunity principles at all, or whether he only asserts that she cannot prevail on the merits of a sovereign immunity defense. Count I alleges that Ms. Pierre acted in "bad faith or with malicious purpose or in a manner exhibiting wanton or willful disregard of Plaintiff's human rights." These allegations are only necessary if the plaintiff is seeking to overcome a sovereign immunity claim. I therefore conclude that Mr. Lee is not contesting that Ms. Pierre can assert a sovereign immunity defense.[27]

Even viewing the evidence in the light most favorable to Mr. Lee, a reasonable jury could not find that Ms. Pierre's actions were in bad faith, malicious, or in wanton or willful disregard of Mr. Lee's human rights. Citing *Paul,* Mr. Lee argues that there is a jury question whether Mr. Pierre's conduct rose to this level.  ECF No. 229 at 18. In *Paul,* a female plaintiff alleged that a male co-worker committed a battery.  As summarized by the opinion, the facts were:

---

[27] Mr. Lee's citation to *Henderson* does not refute that sovereign immunity principles could apply here. The *Henderson* Court, after finding that police officers owed a duty of care to the plaintiff, evaluated whether nevertheless those officers were protected by sovereign immunity. 737 So. 2d at 537–-39.

> Paul and Holbrook are former employees of PMP. Paul testified that
> Holbrook was her co-worker and not her supervisor. On various
> occasions, Paul worked alone with Holbrook. During some of these
> times, Paul alleges that Holbrook harassed her by asking that she wear
> revealing clothing and suggesting that they engage in sexual relations.
> Paul claims that on two occasions, Holbrook came up behind her while
> she was working and tried to massage her shoulders. On both occasions,
> Paul immediately pulled away and told Holbrook to leave, which he did.
> After Paul complained to PMP's management, she and Holbrook never
> again worked the same shifts and his improper behavior toward her
> ended.

*Paul v. Holbrook*, 696 So. 2d 1311, 1311 (Fla. 5th DCA 1997). The trial court granted

summary judgment for the defendant on the grounds that the alleged battery was "no

more than a 'casual touching'" so the defendant lacked the intent to commit a battery.

*Id.* at 1312. The appellate court reversed, stating, "Based on the record before this

court, a jury could reasonably infer that Holbrook intended to touch Paul in a matter

[sic] that would constitute a battery." *Id. Paul* is inapposite because it did not involve

a public official and the heightened *mens rea* under Section 768.28(9)(a). No

reasonable jury could find that Ms. Pierre's momentary touching of Mr. Lee's back

and stomach rises to the level necessary to abrogate sovereign immunity. Summary

Judgment should be entered for Ms. Pierre on Count I.

     B.    *Unlawful Termination (Counts II and III)*

    Mr. Lee alleges unlawful termination based on "regarded as" disability

discrimination. ECF No. 58 ¶¶ 55–56. The ADA makes it unlawful for an employer to

"discriminate against a qualified individual on the basis of disability in regard to job

application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). "To establish a prima facie case of disability discrimination, a plaintiff must show that he (1) suffers from a disability, (2) is a "qualified' individual", and (3) was discriminated against because of his disability. *Lewis v. Union City, Ga.*, 934 F.3d 1169, 1182 (11th Cir. 2019) ("*Lewis II*"), *on remand from Lewis v. City of Union City, Ga.,* 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*"). To establish the third prong – causation – the plaintiff must "show that the discriminatory motivation was the but-for cause of the adverse employment action." *Collier v. Harland Clarke Corp.*, 820 Fed. Appx. 874, 879 (11th Cir. 2020).

### 1.    Regarded as Disabled

The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

"An individual can satisfy the 'regarded as' definition if [he] can establish that [he] 'has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Mayorga v. Alorica, Inc.*, No. 12-21578-CIV, 2012 WL 3043021, at *8 (S.D. Fla. July 25, 2012) (J. Huck) (citing 42 U.S.C. § 12102(3)(A)). The relevant inquiry when analyzing "regarded as" claims "is not the plaintiff's actual condition, but how the Defendant 'perceived [his] condition, including the reactions and perceptions of persons interacting or working with him."

*Id.* "An employer that takes an adverse action because it fears the consequences of an employee's medical condition [such as the employee being a danger to himself or others] has regarded that employee as disabled." *Lewis II,* 934 F.3d at 1182.

The disability must be perceived by the relevant decisionmaker. *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1185 (11th Cir. 2005); *see Colclough v. Gwinnett Pub. Sch.*, 734 Fed. Appx. 660, 663 (11th Cir. 2018) ("Colclough also did not present evidence reasonably suggesting that the School District's decisionmakers had—or even should have had—notice of his cancer."). The fact that an employer is aware of an impairment is not alone sufficient to show that the employer regarded the employee as disabled or that the perception caused an adverse employment action. *Jenks v. Naples Cmty. Hosp., Inc.*, 829 F. Supp. 2d 1235, 1254 (M.D. Fla. 2011) citing *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1361 (S.D. Fla. 1999) (J. Gold).

The School Board first argues that Mr. Lee was not regarded as disabled because the School Board lacked sufficient notice of Mr. Lee's alleged disability.[28] In response, Mr. Lee cites to the following evidence:

- He "disclosed his gout to the School Board when he began employment in March 2015 and subsequent thereto." ECF No. 229 at 10.

- He "notified the School Board that he was medicated with Uloric and Colchicine." *Id.*

---

[28] Lee's response spends substantial time discussing why his disability was not transitory or minor. Although the School Board's Answer asserts an affirmative defense that Lee's disability was minor or transitory, see ECF No. 136 at 9 (Affirmative Defense 38), the School Board does not move for summary judgment on this basis. Rather, in its motion, the Board argues that, whether or not Mr. Lee was disabled, the Board was unaware of any disability.

- In 2016 and 2017, the School Board downloaded videos showing Mr. Lee exhibiting physical limitations. *Id.* at 7.

- In October 2018, Mr. Lee presented the School Board with DWC-25 forms that disclosed he had "a rheumatological disorder that was not adequately controlled." *Id.* at 10.

- "The School Board also denied Plaintiff's worker's compensation claim because 90% consisted of a pre-existing condition." *Id.* at 7.[29]

- The School Board requested and preserved bus videos on October 30, 2018 that showed Mr. Lee having lower leg problems and trouble walking. *Id.*

- In November 2018, Searchwell learned that Mr. Lee was having physical difficulty moving his leg between the brake and accelerator pedals. *Id.* at 10 (citing ECF No. 259-3 at 24–26, 35–36, 232–37).

Most of this evidence is not material to the pending motion. The relevant inquiry is not what "the School Board" collectively knew; it is whether the person(s) responsible for deciding to terminate Mr. Lee regarded him as disabled. Only the last proffered fact could suggest this kind of knowledge.

Viewed in the light most favorable to Mr. Lee, Mr. Searchwell was aware in November 2018 that Mr. Lee had a physical condition that affected his ability to safely drive a school bus. Mr. Searchwell testified that he received an email update related to Mr. Lee's workers' compensation claim which indicated that Mr. Lee told his treating physician that he was having difficulty moving his legs from the throttle to the brake. ECF No. 259-3 at 24–26, 233, 237.[30]  Mr. Searchwell knew that "if a

---

[29] The undisputed facts show that Mr. Lee's worker's compensation claim was denied by the Florida Department of Financial Services, not the School Board.

[30] At one point in the deposition, Mr. Lee's counsel objected that Mr. Searchwell's testimony about the content of the email was hearsay. ECF No. 259-3 at 233. Nevertheless, Mr. Lee's opposition to the

driver is unable to move their foot from the throttle to the brake, that's a serious safety consequence to the students, to the community, and to the driver himself." *Id.* at 24. He therefore determined that he "needed to act as a director and have some action done to verify if the driver could actually perform the essential functions of the job, driving, which requires you to move your foot from the throttle to the brake in the case of an emergency." *Id.* at 25.

Nevertheless, regardless of whether Mr. Searchwell regarded Mr. Lee as disabled, it is undisputed that Mr. Searchwell lacked authority to terminate Mr. Lee. PSOF ¶ 119. Mr. Searchwell testified that he recommended to the HR Department, the Risk Management Department, and ultimately the Superintendent of Schools that Mr. Lee's employment be terminated. ECF No. 239-3 at 17. He also testified that the ultimate termination decision rested with the Superintendent of Schools and/or the School Board members. *Id.* at 16–17. The record is not clear who made the decision in Mr. Lee's case. Plaintiff has not identified any evidence in the record which genuinely disputes Mr. Searchwell's testimony. Plaintiff also has not pointed to any evidence showing what information was communicated by Mr. Searchwell to other decisionmakers at the School Board, nor has he cited any evidence that the Superintendent, the School Board members, or anyone else involved in the final

---

Board's motion for summary judgment relies on this testimony to infer that the Board knew of Mr. Lee's disability. In any event, the testimony is admissible non-hearsay (not offered for the truth) insofar as it shows that Mr. Searchwell was on notice that Mr. Lee might have a physical limitation and explains why Mr. Searchwell referred Mr. Lee for a dexterity test.

decision to terminate Mr. Lee knew that Mr. Lee suffered from gout or otherwise regarded him as disabled because of his medical condition.

Mr. Searchwell's January 8, 2019, letter does not contradict his testimony that he did not make the decision to terminate Mr. Lee. The letter stated, "Therefore, effective immediately, your employment with the District is terminated." The letter continued, "Your name will be submitted as a termination at the next scheduled School Board meeting on January 23, 2019." On its face, the letter does not create a genuine factual dispute. It does not say that Mr. Searchwell made the termination decision. It does not indicate that someone other than the Superintendent or the School Board members made the termination decision. It is not inconsistent with the termination decision having been made prior to January 8, 2019. Finally, it does not say that Mr. Lee's name is being submitted *to be terminated* at the next School Board meeting. The letter is equally interpreted to say that Mr. Lee's termination has already occurred and will be reported to the full School Board at its next meeting.

In sum, Mr. Lee has failed to produce evidence from which a reasonable jury could conclude that an identifiable person with decision-making authority terminated Mr. Lee's employment because that person regarded him as disabled. Because Mr. Lee cannot sustain one of the essential elements of his wrongful termination causes of action, the School Board is entitled to summary judgment on Counts II and III.

### 2.   Qualified Individual

Next, the School Board argues that Mr. Lee was not a "qualified individual." "The ADA defines a qualified individual as one who, 'with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Lewis II*, 934 F.3d at 1182 (quoting 42 U.S.C. § 12111(8)). An employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." *Lewis II*, 934 F.3d at 1183 (citing 29 C.F.R. § 1630.9(e)).

> " 'Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors.' " *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000)). Courts consider the employer's judgment of whether a particular function is essential, *id.*, and may choose to accord additional weight to such a judgment when the employer is a police department, *cf. Ethridge v. State of Alabama*, 860 F. Supp. 808, 816 (M.D. Ala. 1994). But courts must consider also:
>
> > "any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs."
>
> *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (citing 29 C.F.R. §1630.2(n)(3)(ii)-(vii)). Accordingly, "[a]lthough the employer's judgment is 'entitled to substantial weight in the calculus,' this factor alone is not conclusive." *Id.* (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1285 (11th Cir. 2007)).

*Lewis II*, 934 F.3d at 1182.

The School Board argues that Mr. Lee was not a "qualified individual" for three reasons. First, he could not perform the essential job function of safely driving a school bus. Second, he was unable to work cooperatively with others. Third, he was a direct threat to himself, schoolchildren, and motorists. I need not resolve this issue

because even assuming Mr. Lee was a "qualified individual," no reasonable jury could find that him being regarded as disabled was the but-for cause of his termination.

### 3.   But-For Causation

The School Board argues that Mr. Lee cannot show that discriminatory motive was the but-for cause of his termination. The School Board asserts that Mr. Lee was fired for failing the dexterity test, not because of any discriminatory animus.

Generally, where, as here, an ADA plaintiff seeks to prove discriminatory intent through circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *Barber v. Cellco P'ship*, 808 Fed. Appx. 929, 934 (11th Cir. 2020); *see also Jones v. Unity Behavioral Health, LLC.*, No. 9:19-CV-81341, 2020 WL 6731679, at *6 (S.D. Fla. Oct. 13, 2020) (J. Rosenberg). As the *en banc* Eleventh Circuit has explained:

> When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination."

*Lewis I,* 918 F.3d at 1220–21 (en banc) (citations omitted). Where a plaintiff tries to meet its burden through comparator evidence, he must show that he and the

comparators are "similarly situated in all material respects." *Lewis I,* 918 F.3d at 1226.

*McDonnell Douglas* is not the exclusive means by which a plaintiff can circumstantially prove discriminatory intent, however. "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can rely on a "convincing mosaic" of circumstantial evidence. "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185 (citations omitted).

The discriminatory intent question focuses on the person making the termination decision. "'Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.' When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270,

1274 (11th Cir. 2002) (citations omitted). "Normally, then, we look only to the conduct of the decisionmaker—the party with the 'power to actually discharge the employee.'" *Lewis II,* 934 F.3d at 1196 (J. Tjoflat, dissenting in part) citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam).

In some circumstances, discriminatory animus can be imputed to a decisionmaker under "cat's paw" agency principles. "The cat's paw theory provides that discriminatory animus may be imputed to a neutral decision-maker if a supervisor recommends an adverse employment action due to a discriminatory animus and that recommendation is a motivating factor of the decision-maker's ultimate adverse employment action . . . These principles apply when a recommending supervisor's discriminatory animus was a but-for cause of, 'or determinative influence on,' the decision-maker's ultimate decision. *Quintero v. Publix Super Markets, Inc.*, 18-CV-21615, 2020 WL 607117, at *23 (S.D. Fla. Feb. 7, 2020) (J. Gayles).

Mr. Lee has not adequately identified who made the decision to fire him and what information was considered in making that decision. Therefore, no reasonable jury could conclude that Mr. Lee's alleged disability was the but-for cause of the termination decision. As discussed above, it is undisputed that Mr. Searchwell did not have the authority to terminate Mr. Lee, nor has Mr. Lee identified the person(s) who had made that decision. There is evidence that Mr. Searchwell made a recommendation to multiple people to terminate Mr. Lee. There is no evidence that any of them harbored discriminatory animus toward Mr. Lee. Finally, even assuming

(without deciding) that Mr. Searchwell had discriminatory intent, there is insufficient evidence that Mr. Searchwell exercised determinative influence over the ultimate decisionmaker. Hence, Mr. Lee fails to show a "cat's paw" situation.

Independently, Mr. Lee has not offered sufficient comparator evidence to create a *prima facie* inference of discriminatory intent. His summary judgment pleadings lack any analysis of how he and his comparators are similarly situated in all material respects. The Response to the Motion for Summary Judgment argues that Mr. Lee was treated differently from other employees who had to take the dexterity test, and asserts that "retesting is commonplace." ECF No. 229 at 16. His Statement of Material Facts makes only conclusory statements about comparators, such as:

- "Indeed, School Bus drivers besides Plaintiff have been allowed to make multiple test mistakes, take a retest or are passed even though they did not successfully perform the test." PSOF ¶ 108 (record citations omitted). "By termination effective immediately, Mr. Lee was treated differently from other bus drivers who were observed by Mosely and the School Board visibly to have physical or medical problems climbing the bus stairs but 50% were allowed to keep working as bus drivers while 50% were allowed time off to recover before resuming bus driving duties. No drivers were fired. The drivers were allowed to pass a physical, are reassigned or are allowed to stay home." PSOF ¶ 120 (record citations omitted). The cited support for these assertions is deposition testimony by Mr. Mosley and Marvin

Jackson. ECF No. 259-7 at 202–203; ECF No. 259-9 at 19–39, 45–51, 156–73, 183–95.

- "Searchwell was aware prior to terminating Mr. Lee that other drivers had temporary illness or injury, were allowed time off to recover and returned to resume bus driving duties. School Board bus drivers were entitled to apply for leave when they have a problem." PSOF ¶ 121 (citing Searchwell deposition, ECF No. 259-3).

Even viewed in the light most favorable to Mr. Lee, the evidence cited from the record falls short of meeting Mr. Lee's burden of showing that these other employees were similarly situated to Mr. Lee in all material respects. Mr. Jackson had personal knowledge of only one other person being given multiple opportunities to pass the dexterity test – a Haitian male named Pierre LNU who took his dexterity test immediately before Mr. Jackson on August 3, 2020. ECF No. 259-9 at 29–39. Mr. Jackson testified that Pierre made several mistakes during the dexterity test. None of those mistakes involved the first component of the test, which is what Mr. Lee was unable to complete. Mr. Jackson also identified other individuals who he saw having difficulty getting on and off buses. *Id.* at 116–17, 156–66, 183–95. He provided no testimony about whether these individuals subsequently failed a dexterity test. Mr. Mosley had personal knowledge of only one person who had trouble getting out of a bus – Linda Brown. ECF No. 259-7 at 113. He provided no other details about Ms. Brown, including whether she failed a subsequent dexterity test. Mr. Searchwell recognized the name Linda Brown but did not recall dealing with any medical issues

relating to her. ECF No. 293-3 at 94. The cited materials do not reveal Mr. Searchwell discussing identifiable comparators.

Mr. Lee has not shown that a reasonable jury could find that the relevant decisionmaker(s) regarded him as disabled. He also has not shown causation via the *McDonnell Douglas* framework, nor has he otherwise presented a convincing mosaic of circumstantial evidence that would support a reasonable jury finding that his disability was the but-for cause of his termination. For all these reasons, summary judgment should be entered for the School Board on Counts II and III.

### C.    *Retaliation (Counts IV and V)*

Title VII (Count IV) prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The FCRA (Count V) contains a similar provision and is analyzed under the same framework. Fla. Stat. § 760.10 *et seq.* (2020); *see Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004) ("The [FCRA] was patterned after Title VII, and Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII.").

The Eleventh Circuit *en banc* recently summarized the framework for assessing Title VII retaliation claims:

> To make a prima facie case for a claim of retaliation under Title VII, a plaintiff must first show (1) that "she engaged in statutorily protected activity," (2) that "she suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." *Jefferson*

*v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).

Once the prima facie case is established, it creates a "presumption that the adverse action was the product of an intent to retaliate." *Bryant*, 575 F.3d at 1308. The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action. *Id*. If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions." *Id*. To establish the necessary causation, a plaintiff must demonstrate that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). In other words, "a plaintiff must prove that had she not [engaged in the protected conduct], she would not have been fired." *Jefferson*, 891 F.3d at 924. "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.,* 704 F.3d 1327, 1333 (11th Cir. 2013).

*Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (en banc). For purposes of establishing a *prima facie* case, an adverse employment action exists if there is a " 'tangible, negative effect on the plaintiff's employment.' A 'tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Martin v. Eli Lilly & Co.*, 702 Fed. Appx. 952, 956 (11th Cir. 2017) (internal citations omitted). The Court must "apply an objective test and require a plaintiff to demonstrate that a reasonable person in her position would view the employment action in question as adverse." *Id*.

To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and

the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (internal quotation marks and citation omitted). The relatedness between the protected activity and adverse action may be demonstrated by temporal proximity. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Once the plaintiff establishes a prima facie case of discrimination, the defendant's burden of proffering a legitimate non-discriminatory reason "is a low bar to hurdle. The burden placed on the employer is only an evidentiary one; a burden of production that 'can involve no credibility assessment.' " *Flowers v. Troup County, Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

The plaintiff has a more rigorous burden for demonstrating that the proffered reason is pretextual:

> Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "[A] reason is not pretext for [retaliation] 'unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.' " *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). And to repeat, in determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her.

*Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (brackets in original). "While close temporal proximity between the protected conduct and the

adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Id.* at 1138 n. 15. An intervening event can "undermine[] the significance of any temporal proximity." *Id.* "[M]ere temporal proximity without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007), cited in *Grant v. Miami-Dade County,* 13-22008-CIV, 2014 WL 7928394, at *8 (S.D. Fla. Dec. 11, 2014), *aff'd sub nom. Grant v. Miami-Dade County Water & Sewer Dept.*, 636 Fed. Appx. 462 (11th Cir. 2015).

### 1.    Protected Activity

The Third Amended Complaint alleges that Mr. Lee engaged in the following protected activity: (1) complaining to Mosley and Holloman about Pierre's alleged sexual harassment, ECF No. 58 ¶ 24, and (2) complaining to "his superiors" about Pierre and Mosley's transferring him to Belle Glade, ECF No. 58 ¶ 25. *See also Id.* ¶ 78 ("Plaintiff was engaged in an activity protected under Title VII in his complaints to the Board about sexual harassment by Pierre and retaliation by Mosley and Pierre for Plaintiff's sexual harassment complaints against Pierre.").

The Response to the Motion for Summary Judgment argues a third protected activity that is not pled in the Third Amended Complaint: "Plaintiff's...protected activity complaint of Mosley and Searchwell retaliating against him less than four weeks after the School Board's October 16, 2018 discipline of Mosley and Pierre for sexual harassment and retaliation. [DE # 58 ¶¶ 32–35]." ECF No. 229 at 15 (brackets in original). The School Board argues that I should decline to consider this additional alleged protected activity because "a response to a summary judgment motion cannot

create a new claim or theory of liability." *Aning v. Fed. Nat'l Mortgage Ass'n*, 663 Fed. Appx. 773, 775 (11th Cir. 2016). For completeness of the record, and because it does not change my ultimate recommendation, I will discuss this third protected activity.

2.   <u>Good Faith Reasonable Belief</u>

The School Board first asserts that Mr. Lee did not have a good faith reasonable belief that he was sexually harassed. ECF No. 204 at 15–16.  In his deposition, Mr. Lee described the incident as follows:

> I was standing in the entrance to Jack's office door into his office.  As I was standing there, Tammy came in.  She proceeded to lift my shirt up off – off my shoulders, telling me it was nice material.  She liked it. Okay.  So I tried to move inward because she had my – had the doorway blocked.  So instead of going into her trying to get out, I went forward into Jack's office.  After about a couple – 10 minutes she came – Jack came back into the office at which time she said, Hey, Jack watch this. At which time she sexually harassed me a second time by taking her hand, her arm, placing it on my back lower side and then she proceeded to go around to the front of me and touch my midsection.

ECF No. 206-1 at 731. Although there is conflicting evidence on this issue, viewing the evidence in the light most favorable to Mr. Lee, and therefore accepting his version of the events, a reasonable jury could conclude that Mr. Lee believed in good faith that sexual harassment had occurred.[31]

3.   <u>Adverse Employment Action</u>

The School Board next argues that no adverse employment actions were taken against Mr. Lee, stating that "[t]he acts complained fail to satisfy the second element

---

[31] Orozco testified in his deposition that he saw Pierre put her hand on Mr. Lee's middle/upper back. He did not testify that he saw Pierre touch Mr. Lee's stomach. Mr. Orozco told English that Pierre touched Lee's midsection. Pierre says she tickled Lee on his right side as a joke. ECF No. 206-6 at 8–9.  She testified that Lee turned red and was laughing. ECF No. 206-6 at 11–12.

of a retaliation claim because they: (a) did not occur; and/or (b) did not result in tangible, negative effects on employment or dissuade him from making or supporting a charge of discrimination." ECF No. 204 at 17. The Third Amended Complaint identifies the adverse employment actions as: "The Board moved Plaintiff's workplace to Belle Glade and he suffered unreasonable interference with his performance and creation of an intimidating, hostile or offensive work environment. Plaintiff was returned to Royal Palm only to have Mosley also return as his supervisor, subjected to pretextual, subjective dexterity testing because of his complaints to the Board about Mosley and Pierre which resulted in his job termination without warning on January 8, 2019." ECF No. 58 ¶ 79.

### a. **Termination**

The School Board's motion does not address the allegation that Mr. Lee's employment was terminated in retaliation for his protected activity. ECF No. 204 at 17–18. Termination is the quintessential adverse employment action.

### b. **Mosley Reinstated as Supervisor**

Mr. Lee has failed to show that restoring Mr. Mosley as his supervisor was, by itself, an adverse employment action.   It is undisputed that Mr. Mosley returned to Royal Palm Beach as Mr. Lee's supervisor in or about late October 2018. That action, alone, is not an adverse employment action. Mr. Lee has not cited any evidence that Mr. Mosley did anything to affect Mr. Lee's employment after being transferred back. Mr. Lee alleged on November 13 that Mr. Mosley was retaliating against him by initiating a new misconduct investigation. He has not shown that Mr. Mosley was

involved in Mr. Lee's subsequent job assignments, being placed on administrative leave, the dexterity testing decision, or the decision to terminate Mr. Lee. As such, he has not shown that Mr. Mosley returning as his supervisor caused a tangible, negative effect on his employment.

### c. **Transfer to Belle Glade Facility**

Mr. Lee argues that requiring him to commute over 100 miles round trip to Belle Glade rose to the level of an adverse employment action. I need not resolve that issue because even assuming *arguendo* that it was an adverse employment action, Mr. Lee has failed to make a *prima facie* showing that his transfer to Belle Glade was in retaliation for his complaints against Mr. Mosley and Ms. Pierre. The letter transferring Mr. Lee was signed by Pete DiDonato. Mr. Lee has not identified any evidence in the record that Mr. DiDonato was not the final decisionmaker or that Mr. DiDonato was aware of Mr. Lee's complaints against Mr. Mosley and Ms. Pierre. Nor has Mr. Lee identified any evidence that Mr. Mosley or Ms. Pierre (or anyone else with knowledge of his complaints) directly or indirectly made the decision to transfer him. Mr. Mosley's reprimand letter indicates that Mr. Mosley recommended the transfer, but acknowledges that Mr. Mosley lacked the authority to transfer Mr. Lee. Finally, Mr. Lee has not identified any comparator evidence that could create a circumstantial inference of discriminatory intent.

Even if Mr. Lee had made a *prima facie* showing, he has not rebutted the Board's explanation that Mr. Lee was temporarily transferred until the misconduct investigation against him could be resolved. His transfer lasted for 16 work days.

### d. **Unreasonable Interference with Performance**

Mr. Lee also has failed to show that "he suffered unreasonable interference with his performance and creation of an intimidating, hostile or offensive work environment." ECF No. 58 ¶ 79. The Third Amended Complaint summarily argues that this situation arose after his complaints, but neither Mr. Lee's Statement of Facts nor his Response to the Motion for Summary Judgment fleshes out these conclusory allegations. They fail to identify specific acts from which a reasonable jury could find retaliation or a hostile work environment. At most, the Response references Mr. Lee being "removed from bus driving" without any citation to the evidentiary record. ECF No. 229 at 16. It is possible that Mr. Lee is referring to being placed on leave with pay for approximately two weeks in February and March 2018 while the Western Pines Incident was being investigated. A reasonable jury could not conclude that being placed on paid leave for two weeks had a tangible negative effect on Mr. Lee's employment.

### e. **Transfer to M & PO**

Mr. Lee's claim that he was transferred to M & PO in retaliation for protected activity fails for the same reasons as his claim related to the Belle Glade transfer.[32] Here, Mr. Lee has not identified the decisionmaker behind his transfer to M & PO. He has not made a *prima facie* showing that the transfer was retaliatory. Finally, he

---

[32] The claim based on the M & PO transfer is not addressed in Mr. Lee's Response to the Motion for Summary Judgment and is arguably waived. ECF No. 229. Nevertheless, I address it for the completeness of the record.

has not rebutted the School Board's proffered explanation that the transfer resulted from the investigation into the Western Pines Incident.

        4.   <u>But-For Causation</u>

The termination of Mr. Lee's employment was an adverse employment action. The School Board asserts that it took this action because Mr. Lee failed the dexterity test, not in retaliation for his prior complaints. Mr. Lee argues that the dexterity text was a pretext.

Mr. Lee has failed to meet his burden of showing that retaliation was the but-for cause of his termination. Just as with Counts II and III, the evidence in the record would not support a reasonable jury finding that the decisionmaker who terminated Mr. Lee's employment was aware of the protected conduct. There is no evidence that the Superintendent or any school board member knew of Mr. Lee's complaints. Mr. Searchwell was not aware of the November 2018 complaint against him.[33] Also, Mr. Lee has failed to produce sufficient comparator evidence to infer a *prima facie* case of retaliatory intent.

Separately, Mr. Lee seeks to infer discriminatory intent from temporal proximity and the fact that "the decision-makers were aware of the protected conduct,

---

[33] Mr. Lee argues, "Searchwell did not recall, but did not deny, being notified of Plaintiff's November 13, 2018 retaliation complaint against him." ECF No. 229 at 15–16 (citing ECF No. 259-3 at 143–44); *see also* ECF No. 259-3 at 141–42. Absent affirmative evidence that Mr. Searchwell was aware of the complaint, his lack of recollection and non-denial is not a sufficient basis from which a reasonable jury could infer knowledge.

and that the protected activity and the adverse action were not wholly unrelated." ECF No. 229 at 16–17. First, as noted, the record does not support a finding that the ultimate decisionmakers were aware of the protected conduct. Second, the temporal proximity evidence does not support an inference of discriminatory intent. Mr. Lee's sexual harassment complaint and his complaint about the Belle Glade transfer both occurred over a year before he was terminated in January 2019. His complaint in November 2018 preceded the failed dexterity test, which constitutes a significant intervening event that precludes an inference of discriminatory intent based on temporal proximity.

## D.    *FDOE Regulations and Dexterity Testing Procedures*

One final note. For his discrimination claims and his retaliation claims Mr. Lee makes much of what he alleges were improprieties in the administration of the dexterity test, including non-compliance with the FDOE Guidelines. He cites no authority for the proposition that the School Board was required to follow these Guidelines. At best, he cites testimony by the FDOE corporate representative that FDOE considers the Guidelines to be minimums that every school district must follow. ECF No. 259-8 at 21–22. There is a serious question whether witness testimony on this issue is proper. The parties have not briefed whether this issue is subject to fact testimony or should be resolved by the Court as a matter of law. Regardless, I need not resolve this issue to decide the pending motion.

Even assuming *arguendo* that the School Board improperly failed to comply with the FDOE Guidelines or treated Mr. Lee differently by denying him multiple

opportunities to retake the dexterity test, Mr. Lee still bears the burden of showing that a reasonable jury could find that his disability or his protected activity was the but-for cause of this disparate treatment. For the reasons stated above, he cannot meet that burden. Additionally, he has not cited any evidence that the test examiners were aware of his gout or his employment-related complaints, nor has he cited any evidence that they administered the dexterity test differently to employees similarly-situated to Mr. Lee in all material respects. In sum, even assuming there were irregularities in Mr. Lee's dexterity test, he has failed to demonstrate that any disparate treatment was *because of* his gout or his protected activity.

## V.     CONCLUSION

For the foregoing reasons, it is RECOMMENDED that Defendants' Motion for Summary Judgment be GRANTED and that judgment be entered in favor of Tammy Pierre on Count I and in favor of the School Board of Palm Beach County on Counts II–V.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Robin L. Rosenberg, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE AND SUBMITTED** in Chambers this 4th day of February, 2021, at West Palm Beach in the Southern District of Florida.

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE